These causes are here on petitions for writ of mandamus. The petitioners seek a writ of mandamus compelling the trial court to stay the pending litigation and to submit the parties' dispute to arbitration.
Petitioner Tennessee Gas Pipeline Company entered into a long-term "Master Agreement" with respondent, Tre-J, in which Tennessee Gas agreed to purchase natural gas from Tre-J's Blue Gut field, and Tre-J agreed to dedicate all of the reserves in that field to Tennessee Gas. The agreement was drafted by Tennessee Gas and contains an extensive arbitration clause.
In connection with the Master Agreement, Tennessee Gas agreed to allow petitioner Warrior Basin Gas Company to purchase the gas from Tre-J for a two-year period. This led to an agreement (the "Gas Purchase Contract") between Tre-J and Warrior Basin; it is that agreement that is in issue here. That agreement also was drafted by Tennessee Gas, and it also contains an arbitration clause. That clause reads as follows:
 "ARBITRATION — In the event of any dispute or controversy between the parties hereto involving the operations under this Contract, same shall be settled by arbitration. Each of the parties shall appoint an arbitrator, and the two appointed shall select a third. The award of any two arbitrators shall be conclusive upon the parties and shall be made within thirty (30) days after the appointment of the first arbitrator." (Emphasis added.)
The subject contract also provided for the quantity of gas to be purchased:
 "9. QUANTITY — Buyer agrees to purchase and Seller agrees to deliver to Buyer, subject to the capability of Seller's well(s), up to ten thousand (10,000) MMBtu of gas per day during the term hereof. If during any calendar quarter Buyer purchases a total quantity of gas less than seventy-five percent (75%) of the gas made available by Seller to Buyer hereunder, Seller shall have the right to terminate this Contract upon thirty (30) days written notice to Buyer with respect to the gas not purchased by Buyer. In the event Buyer nominates a quantity of gas in excess of ten thousand (10,000) MMBtu, Seller shall have the right, but not the obligation to sell such excess gas to Buyer."
The gas purchase agreement further provided that the price paid would be $2.65/MMBtu for the first six months, and it also provided for price adjustments every six months thereafter based on a Labor Department index.
Under the terms of the agreement, Tre-J would drill the wells and deliver the gas to a pipeline leading to the Tennessee Gas line. Tre-J was to be responsible for the testing and purification of its gas, with title to vest in Tennessee Gas only upon its entry into Tennessee Gas's pipeline.
Approximately ten months after Tre-J and Warrior Basin contracted, Warrior Basin requested that the price be lowered from $2.65 to $1.91/MMBtu. Tre-J refused to agree to that request. At a later date, Warrior Basin, by letter, demanded an immediate reduction to the desired price, *Page 1366 
which Tre-J again refused. No arbitration was initiated at that time. Instead, Warrior Basin notified Tre-J that it would thenceforth accept no more than 1,400 MMBtu per day.
Tre-J filed suit for specific performance and for preliminary and permanent injunctive relief, and sought a declaration that the contract required Warrior Basin to accept Tre-J's entire production, up to 10,000 MMBtu per day. Warrior Basin and Tennessee Gas promptly moved to compel arbitration under the terms of the gas purchase contract. The trial court found that, while the Federal Arbitration Act, 9 U.S.C. § 1, et seq., would apply, because interstate commerce was involved, the intent of the parties was that the arbitration clause did not apply to this type of dispute. Because we disagree with the conclusion reached by the trial court, we grant the writ.
The parties disagree on the controlling cases and the standard of review to be applied by this Court. In support of their petitions, Warrior Basin and Tennessee Gas rely on the language of the contract, and on the strong federal policy in favor of arbitration. Petitioners cite a number of federal cases in support of their position, including AT TTechnologies, Inc. v. Communications Workers of America,475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); MitsubishiMotors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614,105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); Moses H. Cone MemorialHospital v. Mercury Construction Corp., 460 U.S. 1,103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Nursing Home Hospital Union No.434 AFL-CIO-LDIU v. Sky Vue Terrace, Inc., 759 F.2d 1094 (3d Cir. 1985); Wick v. Atlantic Marine, Inc., 605 F.2d 166 (5th Cir. 1979); RPJ Energy Fund Management, Inc. v. Collins,552 F. Supp. 946 (D.Minn. 1982). Petitioners' cases amply support their contention that arbitration clauses are to be liberally construed in favor of arbitration, Mitsubishi, supra; Moses H.Cone, supra, and that an order to arbitrate a particular matter should not be denied unless it may be said with positiveassurance that the arbitration clause is not susceptible of interpretation that it covers the asserted dispute. AT TTechnologies, supra; Wick, supra.
In opposition to the petitions, Tre-J argues that, at its root, the dispute between the parties is merely a matter of contract interpretation and that it is to be governed strictly by contract principles; Tre-J, therefore, contends that the federal arbitration policy of requiring arbitration does not come into play until it is determined that the parties intended the arbitration clause to govern the particular issue in dispute. Tre-J contends that the parties did not intend this type of dispute to be the subject of arbitration. Further, Tre-J argues that, construing the contract against the drafter,Rivers v. Oakwood College, 442 So.2d 74 (Ala. 1983), the trial court correctly concluded that the parties intended only anarrow arbitration clause, one applying only to disputes overphysical operations, i.e., drilling, pumping, and pipeline operations. On a factual issue of this sort, Tre-J argues, the decision of the trial court must be affirmed unless it is shown to be clearly erroneous. For these propositions, Tre-J cites AT T Technologies, supra; Mitsubishi, supra; John F. Harkins Co.v. Waldinger Corp., 796 F.2d 657 (3d Cir. 1986), cert. denied, ___ U.S. ___, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987); Twin CityMonorail, Inc. v. Robbins Myers, Inc., 728 F.2d 1069 (8th Cir. 1984); Mediterranean Enterprises, Inc. v. Ssangyong Corp.,708 F.2d 1458 (9th Cir. 1983); and Seaboard Coast Line R.R. v.Trailer Train Co., 690 F.2d 1343 (11th Cir. 1982).
In support of its argument that the trial court correctly construed the language of the arbitration agreement, Tre-J introduced the text of the 15-year Master Agreement drafted by Tennessee Gas. That agreement read, in pertinent part, as follows:
 "7-A. 1 Any controversy arising between the Parties with respect to subsections 5.5 or 10.2.3 of this Agreement not resolved by agreement shall be determined by a board of arbitration. . . ."
Sections 5.5 and 10.2.3 provide as follows:
 "5.5 If the first determination of Proved Recoverable Dry Gas Reserves or any subsequent determination of same is *Page 1367 
not agreed upon within thirty (30) days after written request therefor or prior to initial deliveries under this agreement, then the first determination or such subsequent determination shall be made by arbitration upon written demand by Buyer or Seller. Buyer shall be released from any obligation to pay for gas not taken hereunder until such first determination has been made."
 "10.2.3 In the event a Party selects the pricing method set forth in paragraph (c) of subsection 10.1.1 or paragraph (b) of subsection 10.2.2, above, and the prices for Fuel Oil No. 6 specified therein cease to be published in the manner or with the frequency contemplated therein, Buyer and Seller shall, within ninety (90) days following such cessation of publication, mutually agree in writing as to a substitute publication from which the highest and lowest daily prices of Fuel Oil No. 6 may be obtained. In the event that a substitute publication is not available, Buyer and Seller shall mutually agree in writing as to an alternative manner in which to compute the price payable for gas pursuant to paragraph (c) of subsection 10.1.1 or paragraph (b) of subsection 10.2.2. If Buyer and Seller are unable to mutually agree on a substitute publication, or an alternate price computation method as the case may be, such matter shall be determined by arbitration as provided in Section 7-A of Exhibit 'A' hereto."
Tre-J cites this Master Agreement as an example of abroad arbitration agreement used by Tennessee Gas when it intends for arbitration to apply to all disputes over a particular provision.
The question of the effect of arbitration clauses in contracts involving interstate commerce has been to this Court frequently, of late, and the record indicates that both sides were aware that the scope of the arbitration clause in the present case would ultimately reach this Court. Even the trial judge anticipated that if he ruled as he did that this petition for mandamus would be filed, and the parties even speculated on the time it would require this Court to issue a ruling.[1] Even though it is apparent that the parties and the trial judge were aware that these petitions would be filed, we will address the legal issues presented as we understand them to be submitted to us.
The first issue we must address is the standard of review we must apply. Petitioners contend that we should review the trial court's refusal to stay this action pending arbitration without applying the traditional "clearly erroneous" standard. Respondent, on the other hand, strongly contends that the "clearly erroneous" standard is applicable. It citesSeaboard Coast Line R.R. v. Trailer Train Co., 690 F.2d 1343,1348-49 (11th Cir. 1982), wherein the Eleventh Circuit Court of Appeals held that notwithstanding the applicability of the Federal Arbitration Act to an arbitration provision, the question of whether a contract's arbitration clause requires arbitration of a given dispute remains a matter of *Page 1368 
contractual interpretation to be determined by the intent of the parties. The Seaboard court wrote:
 "We begin our analysis by noting the Federal policy favoring arbitration over litigation, 9 U.S.C. § 1 et seq. (Federal Arbitration Act) [citations omitted]. This federal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration [citations omitted].
 "Nevertheless, the question of whether a contract's arbitration clause requires arbitration of a given dispute remains a matter of contract interpretation. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 242, 82 S.Ct. 1318, 1321, 8 L.Ed.2d 462, 466 (1962); Par-Knit Mills, Inc. v. Stockbridge Fabrics Company, Ltd., 636 F.2d 51, 54
(3d Cir. 1980); Totem Marine Tug Barge, Inc. v. North American Towing, Inc., 607 F.2d 649, 651 (5th Cir. 1979). Such a determination rests on the intent of the parties. See Par-Knit Mills, Inc., supra, 636 F.2d at 54-55 (arbitration predicated on agreement of parties to arbitrate); Local Union No. 4-449 [Oil, Chemical and Atomic Workers Union v. Amoco Chemical Corp.], supra, 589 F.2d [162] at 163-64 [5th Cir. 1979] (when no ambiguity as to intent of parties, no doubt to be resolved). A party may not be required to arbitrate a dispute it did not agree to arbitrate; Atkinson v. Sinclair Refining Co., supra, 370 U.S. at 242, 82 S.Ct. at 1321, 8 L.Ed.2d at 466; Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B.V., 480 F. Supp. 1270, 1275 (E.D.La. 1979), '[i]f the contract does not [provide for arbitration], then no Federal law requires arbitration,' Commercial Metals Co. v. Balfour, Guthrie Company, Ltd., 577 F.2d 264, 266
(5[t]h Cir. 1978).
 "The district court in this case determined that the present dispute does not fall within the arbitration clause of the Car Contract. A determination by a trial court of what was intended by the parties in their agreement is a question of fact, not to be disturbed by this court unless clearly erroneous. Rule 52(a), Fed.R.Civ.P.; Western Beef, Inc. v. Compton Investment Co., 611 F.2d 587, 591 (5th Cir. 1980) (to the extent finding of trial court as to intent of parties not clearly erroneous, this finding must be affirmed); Zapata Marine Service v. O/Y Finnlines, Ltd., 571 F.2d 208, 209 (5th Cir. 1978) (upholding as not clearly erroneous district court's determination of the forum agreed to by parties). . . . '[W]here the conclusions of the trial judge may reasonably be inferred from the record, such conclusions should not be disturbed on appeal . . . even though conflicting inferences of equal reasonableness may be drawn from a review of the same body of evidence.' [McKensie v. Sea Land Service, Inc., 551 F.2d 91 (5th Cir. (1977)] (quoting Skidmore v. Grueninger, 506 F.2d 716, 724 (5th Cir. 1975)."
Seaboard, supra, at 1348-49. (Emphasis added.)
While petitioners contend that the "clearly erroneous" standard of review does not apply, petitioners nevertheless say that, even if that standard of review does apply, the trial court is due to be directed to stay proceedings in this case.
For the purposes of ruling on this petition for the writ of mandamus, we apply the traditional standard of review, and we assume that the trial court found, as a fact, that the parties did not intend for this particular dispute to be covered by the arbitration clause. In other words, although the finding of the trial court is not specific, we must assume that the trial judge, by denying the stay of proceedings pending arbitration, necessarily found that the parties did not intend for the arbitration clause to cover the dispute. We make this assumption based on the rule that "when the trial court makes no formal findings of fact, the reviewing court will assume that the trial court made those findings which will justify the decree rendered." Smith v. Citicorp Person-to-Person FinancialCenters, Inc., 477 So.2d 308, 309 (Ala. 1985). *Page 1369 
Our first task is to determine whether the parties here agreed to arbitrate the dispute, as a matter of law. There is no question that the contract is one involving interstate commerce and that it is governed by the provisions of the Federal Arbitration Act. In making our determination, therefore, it is our opinion that we must apply federal substantive law of arbitrability, and, as we understand that law, it states that the intent of the parties must control, but that intent is generously construed as to issues of arbitrability. Mitsubishi Motors Corp. v. SolerChrysler-Plymouth, Inc., supra.
The federal policy favoring arbitration of disputes in commercial contracts remains viable. In Shearson/AmericanExpress, Inc. v. McMahon, ___ U.S. ___, 107 S.Ct. 2332,96 L.Ed.2d 185 (1987), respondents were customers of petitioner Shearson, a brokerage firm registered with the Securities and Exchange Commission, under customer agreements that provided for arbitration of any controversy relating to their accounts. Respondents had filed suit in the federal district court against Shearson and its representative who handled their account, alleging violations of the antifraud provisions in Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10(b)-5, and of the Racketeer Influenced and Corrupt Organizations Act (RICO). Petitioner moved to compel arbitration of the claims pursuant to Section 3 of the Federal Arbitration Act, which requires a court to stay its proceedings if it is satisfied that an issue before it is arbitrable under an arbitration agreement. The district court held that respondents' Exchange Act claims were arbitrable, but that their RICO claim was not. The Court of Appeals reversed as to the Exchange Act claim and affirmed as to the RICO claim. The Supreme Court held:
 "The Federal Arbitration Act, 9 U.S.C. § 1
et seq., provides the starting point for answering the questions raised in this case. The Act was intended to 'reverse centuries of judicial hostility to arbitration agreements,' Scherk v. Alberto-Culver Co., [417 U.S. 506] at 510 [94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974)], by 'placing arbitration agreements upon the same footing as other contracts.' 417 U.S., at 511
[94 S.Ct. at 2453], quoting H.R. Rep. 96, 68th Cong., 1st Sess. 1, 2 (1924). The Arbitration Act accomplishes this purpose by providing that arbitration agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. The Act also provides that a court must stay its proceedings if it is satisfied that an issue before it is arbitrable under the agreement, section 3; and it authorizes a federal district court to issue an order compelling arbitration if there has been a 'failure, neglect, or refusal' to comply with the arbitration agreement, section 4.
 "The Arbitration Act thus establishes a 'federal policy favoring arbitration,' Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24 [103 S.Ct. 927, 941, 74 L.Ed.2d 765] (1983), requiring that 'we rigorously enforce agreements to arbitrate.' Dean Witter Reynolds Inc. v. Byrd, 470 U.S. [213], at 221 [105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985)]. This duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights. As we observed in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., [473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)], 'we are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals' should inhibit enforcement of the Act ' "in controversies based on statutes." ' 473 U.S., at 627 [105 S.Ct. at 3354], quoting Wilko v. Swan, 346 U.S. 427, 432
[74 S.Ct. 182, 185, 98 L.Ed. 168] (1953). Absent a well-founded claim that an arbitration agreement resulted from the sort of fraud or excessive economic power that 'would provide grounds "for the revocation of any contract," ' ibid., the Arbitration Act 'provides no basis for disfavoring agreements to arbitrate statutory *Page 1370 
claims by skewing the otherwise hospitable inquiry into arbitrability.' Ibid.
 "The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overriden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. See 473 U.S., at 628 [105 S.Ct. at 3355]. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent 'will be deducible from [the statute's] text or legislative history,' id., at 628 [105 S.Ct. at 3355], or from an inherent conflict between arbitration and the statute's underlying purposes. See id., at 632-637 [105 S.Ct. at 3357-3360]; Dean Witter Reynolds Inc. v. Byrd, supra, [470 U.S.] at 217 [105 S.Ct. at 1240].
 "To defeat application of the Arbitration Act in this case, therefore, the McMahons must demonstrate that Congress intended to make an exception to the Arbitration Act for claims arising under RICO and the Exchange Act, an intention discernible from the text, history, or purposes of the statute."
___ U.S. at ___, 107 S.Ct. at 2337-38.
In view of this latest expression of the intent of Congress in compelling arbitration when parties have agreed to arbitrate, we must apply principles that would foster the federal policy favoring arbitration. Applying the principles of law most recently stated in Shearson, we can conclude only that the trial judge erred in refusing to stay proceedings pending arbitration. We agree with petitioners that the trial judge's refusal to stay proceedings pending arbitration is not supported by an interpretation of the agreement. Even though we are aware that there was some testimony that the parties to the agreement discussed what "operations" would be covered under the terms of the arbitration clause, we would have to add the word "physical" in front of the word "operations" in the arbitration clause to sustain the order of the trial judge. This we cannot do, especially in view of the federal policy favoring arbitration and requiring courts to "rigorously" enforce arbitration agreements. In short, we cannot say, with positive assurance, that the arbitration clause was intended to exclude the dispute in this case. Cf. United Steelworkers ofAmerica v. Warrior Gulf Navigation Co., 363 U.S. 574, 582-83,80 S.Ct. 1347, 1352-53, 4 L.Ed.2d 1409 (1960).
We hold that the words "operations" in the agreement to arbitrate covers the dispute in this case, as a matter of law.
In Moses H. Cone Memorial Hospital v. Mercury ConstructionCorp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-942,74 L.Ed.2d 765 (1983), the Court said:
 "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."
Based on the above, we are of the opinion that the petitions for writ of mandamus are due to be granted.
WRIT GRANTED.
JONES, SHORES, BEATTY, ADAMS and HOUSTON, JJ., concur.
ALMON, J., concurs in the result.
STEAGALL, J., not sitting.
[1] At one point in the proceeding, the trial judge stated:
 "For the record and perhaps anticipating, if you do go mandamus, that this will narrow it somewhat. The Court is of the opinion that the question of interstate commerce would be resolved, is resolved in the Court's mind, this Trial Judge's mind in favor of defendants but not the interpretation of the arbitration phrase in Section — What is it, 21? Section 21.
 "So, I wanted to state those grounds so there is no mistake in Montgomery and we are going to deal with interstate commerce down there as far as I am concerned. I think it is interstate commerce."
At another point, he noted:
 "THE COURT: As I understood the parties are satisfied with that, is the information I had, if the Court's ruling be that the motion to stay be granted, and the question the Court posed to counsel for Warrior Basin and Tennessee was whether or not that would be agreeable if the Court's ruling be the opposite way which would be the denial of the motion to stay with the Court expecting that those two parties would mandamus and the Court understanding that that is an order for which mandamus would lie from this Court immediately to the Alabama Supreme Court. Is that —
"MR. ZELL: Yes, sir.
"THE COURT: Did I state it fairly there?
"MR. ZELL: I hope you did, Your Honor."