847 So.2d 923 (2002)
AmSOUTH BANK
v.
Leffie Terrell DEES III and Yvette Dees.
1010361.
Supreme Court of Alabama.
October 4, 2002.
*926 Edward A. Dean and Mary Carol Ladd of Armbrecht Jackson, LLP, Mobile, for appellant.
James Lynn Perry of Daniell, Upton, Perry & Morris, P.C., Mobile, for appellees.
HARWOOD, Justice.

I. Procedural History

On June 26, 2001, Leffie Terrell Dees III and Yvette Dees sued AmSouth Bank and Countrywide Home Loans, Inc., asserting claims of breach of contract, breach of fiduciary duty, unjust enrichment, fraud, suppression, deceit, negligence, wantonness, and conspiracy, allegedly arising from the wrongful handling of a mortgage loan. On August 23, 2001, AmSouth filed a motion to compel arbitration of the Deeses' claims on the basis that *927 two agreements between it and thema "Customer Agreement for Depository Account," associated with a checking account the Deeses opened on June 11, 1992, and a April 16, 1996, "AmSouth Equity Line of Credit Agreement"contained arbitration clauses applicable to the dispute.[1] On September 10, 2001, the Deeses filed their "Response and Objection to Defendant, AmSouth Bank's Motion to Compel Arbitration and Defendant, Countrywide Home Loans, Inc.'s Joinder In Same and Motion to Strike" (hereinafter referred to as the "response").[2] On October 12, 2001, the trial court heard oral argument on AmSouth's motion to compel arbitration and, at the conclusion of the hearing, denied it both orally and by a terse entry on the case action summary stating "October 12, 2001DENIED."[3] On October 17, 2001, the court entered an order on the case action summary stating that Countrywide's joinder in seeking to compel arbitration was likewise denied. On November 9, 2001, AmSouth filed a notice of appeal from the denial of its motion.[4] We reverse the order denying AmSouth's motion to compel arbitration and remand the cause.

II. Factual History

On February 4, 1994, the Deeses mortgaged their home to AmSouth Mortgage Company, Inc., to secure a 20-year loan in the amount of $55,090 (that mortgage is hereinafter referred to as "the first mortgage"). AmSouth Mortgage is not a party to this action. The mortgage documents provided for an annual interest rate of 7%. Neither the mortgage nor the underlying promissory note contained an arbitration clause. On October 31, 1994, AmSouth Mortgage assigned the mortgage to Countrywide.
On April 16, 1996, Mr. Dees entered into an "AmSouth Equity Line of Credit Agreement" (hereinafter referred to as the "credit agreement") in connection with obtaining a $15,000 line of credit. Although Mrs. Dees did not sign the credit agreement, she did sign a contemporaneously executed document captioned "Opening an AmSouth Equity Line of Credit Account"; that document identified her as an "account holder." The document stated in its introduction that "[AmSouth has] agreed to establish an open-end account for you...," and went on to explain her right to cancel the account upon taking certain steps. In describing this particular transaction in their complaint, the Deeses state the following: "On April 16, 1996, the Plaintiffs took out a home equity line of credit with AmSouth. Plaintiffs borrowed money on this line of credit." (Emphasis supplied.) The Deeses were given "special checks" to use to obtain advances from the *928 line of credit. The credit agreement stated, in pertinent part:
"Section 2: How AmSouth Equity Line of Credit Checking Works. We will give you a supply of Special Checks. You authorize us to use the signatures on this Agreement in order to identify the signatures on your Special Checks. You may use a Special Check from time to time to obtain an Advance under your Account. A Special Check drawn on your account is a loan from us to you from the time it is posted to your Account, and you will owe us for the amount of the Special Check plus the applicable periodic finance charge.... We will be obligated to make Advances to you to pay Special Checks that comply with the terms of this Agreement up to the amount of your credit limit unless one of the events of default described in Section 20 of this Agreement has occurred."
Section 33 of the credit agreement contains an arbitration clause, which states, in pertinent part:
"Section 33: Arbitration. [A]ny controversy, claim, dispute, or disagreement arising out of, in connection with, or relating to this Agreement or your Loan shall be settled by arbitration in accordance with the then-current applicable Rules of the American Arbitration Association.... You and we specifically acknowledge and agree that this Agreement evidences, and your Loan is, a `transaction involving commerce' under the Federal Arbitration Act, and you and we hereby waive and relinquish any right to claim otherwise."
The line of credit was secured by a second mortgage of the same date on the Deeses' home, signed by both Mr. and Mrs. Dees. The mortgage document did not contain an arbitration clause. The annual interest rate of the line of credit was 1.5% above prime, which, at the time the agreement was executed, translated to an annual interest rate of 9.75%.
Mr. Dees subsequently requested an increase in the line-of-credit limit, and on June 10, 1997, he and Mrs. Dees signed an "Amendment to Adjustable-Rate Line of Credit Mortgage" (hereinafter referred to as the "amended second mortgage"). AmSouth increased the line of credit from $15,000 to $20,000. Subsequently, as the Deeses state in their complaint, "[b]y March 2001, ... the Deeses had fallen behind on the Equity Line." On March 13, 2001, AmSouth purchased the Deeses' first mortgage from Countrywide and increased the amount owing under the Deeses' line of credit to $72,352.20. This amount reflected the addition of $51,210.74 that AmSouth had paid Countrywide for the assignment of the first mortgage. AmSouth proceeded to charge the Deeses interest based on the higher interest rate applicable to the line of credit, instead of the 7% interest rate of the first mortgage. AmSouth did not seek the approval of the Deeses for that course of action.

III. Standard of Review

The issue in this case is whether the trial court erred in denying AmSouth's motion to compel arbitration of the Deeses' claims.
Our standard of review of the denial of a motion to compel arbitration is settled:
"Our caselaw holds that an appeal is the appropriate method for challenging a trial court's denial of a motion to compel arbitration. See A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 360 (Ala.1990). This Court's review of a trial court's refusal to compel arbitration is de novo. See Ex parte Warrior Basin Gas Co., 512 So.2d 1364, 1368 (Ala. 1987)." *929 Crimson Indus., Inc. v. Kirkland, 736 So.2d 597, 600 (Ala.1999).

IV. Requirement of Effect on Interstate Commerce

Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, provides in pertinent part:
"A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
Section 2 preempts conflicting Alabama law, including in particular Ala.Code 1975, § 8-1-41(3), which states that "[a]n agreement to submit a controversy to arbitration" cannot be specifically enforced.
However, the FAA applies to render enforceable a predispute arbitration agreement only if the contract containing the agreement, or the transaction the contract evidences, "substantially affects interstate commerce." Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 766 (Ala.2000); accord Equifirst Corp. v. Ware, 808 So.2d 1, 4 (Ala.2001). The party moving to compel arbitration has the burden of proving that the contract in question evidences a transaction substantially affecting interstate commerce. Chesser v. AmSouth Bank, 846 So.2d 1082 (Ala.2002). Undertaking to carry that burden, AmSouth supported its motion with affidavits from four of its officers: a vice president serving as manager of its equity loan center; a senior vice president serving as wholesale funding manager; a senior vice president serving as manager of electronic banking; and a senior vice president serving as manager of deposit operations. Collectively, those affidavits set forth the following information concerning the effects of the equity-line-of-credit transaction on interstate commerce:[5]
"[1.] In connection with its decision on Mr. Dees's application for the Equity Line of Credit, AmSouth obtained a credit bureau report from Equifax, Inc. (`Equifax'). On information and belief, Equifax is a Georgia corporation with its principal place of business in Atlanta, Georgia.
"[2.] For AmSouth to approve the application for the Equity Line of Credit and the credit limit increase on same, AmSouth required proof that the residential real property pledged as security for the loan was insured. Proof of insurance was attached to the original Application and the Application for the Credit Limit Increase, indicating that the real property securing the loan was insured by State Farm Fire and Casualty Company. On information and belief, State Farm is an Illinois corporation with its principal place of business in Bloomington, Illinois.
"[3.] AmSouth purchased a title insurance policy in connection with the Equity Line of Credit Agreement and the Adjustable Rate Line of Credit Mortgage. This title insurance policy was issued by Commonwealth Land Title Insurance Company. On information and belief, Commonwealth is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. [The copy of the policy attached as an exhibit to the affidavit in question states that Commonwealth is `a Pennsylvania corporation.']

*930 "In connection with the Dees Equity Line of Credit, AmSouth obtained a flood data certification with respect to the real property securing the loan. This flood data certification was provided by First American Flood Data Services, Inc. On information and belief, First American is a Texas corporation with its principal place of business in Austin, Texas. [The copy of the flooddata certification attached as an exhibit to the affidavit in question lists the address of First American as `11902 Burnet Road, Austin, Texas 78758.']
"A substantial portion of the accounting and billing functions for the Dees Equity Line of Credit Account are performed by Total System Services, Inc. (`TSYS'). On information and belief, TSYS is a Georgia corporation with its principal place of business in Columbus, Georgia. The statements for the Dees Equity Line Account are printed and mailed by TSYS in Columbus, Georgia. The computer hardware and software used by TSYS to perform accounting and billing functions for the Dees and other equity line accounts are physically located in Columbus, Georgia.
"[6.] The existence of a prior mortgage(s) and the remaining principal balance on same are important factors in AmSouth's decision regarding whether to loan money to a customer on an equity line of credit. At the time of the application for the Equity Line of Credit, Countrywide was the owner of the First Mortgage on the Dees residence. On information and belief, Countrywide is a New York corporation with its principal place of business in Calibasas, California. Countrywide also has offices in the State of Texas. On his application for the Equity Line of Credit, Mr. Dees listed Countrywide as the owner of the First Mortgage on his house, and gave an address for Countrywide in the State of Texas. [In the `Assignment of Mortgage' whereby AmSouth Mortgage transferred the first mortgage to Countrywide, the mailing address for Countrywide is stated as `400 Countrywide Way, Simi Valley, Ca. XXXXX-XXXX.' In a counterclaim Countrywide filed against the Deeses it identified itself as `a corporation organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located in California.']
"[7.] AmSouth's equity line of credit portfolio (the `Equity Lines Portfolio') is composed of the equity lines of credit made available by AmSouth to individual borrowers. The Equity Line of Credit made available by AmSouth to Leffie T. Dees, account number [account number omitted], is included in the Equity Lines Portfolio.
"[8.] The Equity Lines Portfolio is funded in part by retail deposits made at AmSouth branches in all states where AmSouth branches are located. AmSouth has branches in Alabama, Florida, Georgia, Louisiana, Mississippi and Tennessee.
"The Equity Lines Portfolio is funded in part by wholesale borrowings by AmSouth. AmSouth makes wholesale borrowings from a number of sources outside the State of Alabama, including, for example, the Federal Home Loan Bank of Atlanta, Georgia (`FHLB of Atlanta').
"[10.] AmSouth periodically pledges portions of the Equity Lines Portfolio to the FHLB of Atlanta as security for wholesale borrowings made by AmSouth from the FHLB of Atlanta. The Dees Equity Line of Credit is among the loans that AmSouth has pledged to the FHLB of Atlanta.

*931 "[11.] With respect to many types of accounts, AmSouth offers its customers the ability to perform banking transactions electronically. AmSouth customers must apply to use electronic banking. AmSouth uses one system to process all electronic banking transactions on its customer accounts. AmSouth's electronic banking system may be accessed by telephone, through the Internet, or through a PC Banking dial-up service. Each of these methods requires the use of telephone lines to transmit data. When the PC Banking dial-up service is used, the customer accesses the system using a personal computer and modem to dial a 1-800 telephone number provided by AmSouth.
"[12.] On at least four occasions in the past two years, [preceding September 19, 2001] electronic banking transactions were performed in connection with the Dees Home Equity Line of Credit, Account Number [account number omitted]. For each of these transactions, the customer accessed the AmSouth electronic banking system using PC Banking (i.e., via a personal computer and modem). The customer used telephone lines to perform these transactions.
"[13.] Electronic banking transactions posted to the Dees Home Equity Line Account on September 24, 1999, March 2, 2000, and May 8, 2000. Each of these three transactions represents a withdrawal of funds from the Dees Equity Line Account, and a transfer of those funds to AmSouth checking account number [account number omitted], which checking account is owned by [Mr.] Dees.
"[14.] On May 8, 2002, a fourth electronic banking transaction posted to the Dees Home Equity Line of Credit account... which was a payment in the amount of $500.00. This payment to the Dees Home Equity Line of Credit account was made by an electronic transfer of funds from AmSouth checking account number [account number omitted], which checking account is owned by [Mr. and Mrs.] Dees and Virginia B. Secrest."
The Deeses did not object to, or move to strike, any of these assertions, and they did not offer any evidentiary submissions of their own.
V. The Scope of the Arbitration Clause in the Credit Agreement: Identifying "the Controversy" and "the Transactions."
Pursuant to the express language of Section 2 of the FAA, only a controversy that arises out of the transaction in question can be forced to arbitration. The Deeses state in their brief that "it is nonsensical to contend that [their] present claims arise out of, are in connection with, or relate to the Equity Line," i.e., the credit agreement and the transaction it evidenced. The Deeses argue that the "Equity Line was just the vehicle used by AmSouth to wrongfully change the terms of the Dees/AmSouth First Mortgage." They cite Koullas v. Ramsey, 683 So.2d 415, 417 (Ala.1996), for the proposition that "this Court will not stretch the language of a contract to apply to matters that were not contemplated by the parties when they entered the contract." They then assert that they "could not have contemplated in their wildest dreams the March 2001 manner in which AmSouth would use the Equity Line by increasing the Equity Line principal by $51,210.74 to purchase the [Deeses'] First mortgage from Countrywide." In Koullas the arbitration clause extended only to "disputes between the parties arising under this Agreement," 683 So.2d at 417 (emphasis omitted); this court *932 explained the effect of that limitation as follows:
"Where, as here, an arbitration clause refers to disputes or controversies `arising under' an agreement, the clause will apply only to those claims arising under the terms of the agreement, and it will not extend to matters or claims independent of, or merely collateral to, the agreement. Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala.1994). We agree that, in order for a dispute to be characterized as arising out of or relating to the subject matter of the contract, and thus subject to arbitration, it must at the very least raise some issue that cannot be resolved without a reference to or construction of the contract itself. Dusold v. Porta-John Corp., 167 Ariz. 358, 807 P.2d 526 (Ct.App.1990); Terminix Int'l Co., L.P. v. Michaels, 668 So.2d 1013 (Fla.Dist.Ct.App.1996); Greenwood v. Shefrield, 895 S.W.2d 169 (Mo.App. 1995). If there is no such connection between the claim and the contract, then the claim could not reasonably have been intended to be subject to arbitration within the meaning of a clause that required arbitration only for claims `arising out of or related to' the contract. Dusold."
683 So.2d at 417-18.
Because in Koullas this Court was called upon to construe only the phrase "arising under this [a]greement," observations made in that opinion concerning the construction to be accorded to the different phrase "arising out of or relating to" an agreement were technically dictum. Certainly our caselaw on point as to that latter phrase has distinguished it from the former and has assigned to Koullas its proper role as commenting on only the former. For example, in Ex parte Cupps, 782 So.2d 772 (Ala.2000), this Court stated in a footnote:
"After making this statement [the statement being the passage from Koullas set out above except for its last sentence], the Court in Koullas continued: `If there is no such connection between the claim and the contract, then the claim could not reasonably have been intended to be subject to arbitration within the meaning of a clause that required arbitration only for claims "arising out of or related to" the contract.' 683 So.2d at 418. This particular statement, however, is dictum in that the arbitration clause in that case did not include the language `arising out of or related to.' Thus, while it would appear from this sentence that the term `arising out of or related to' receives the same construction as `arising from' and `arising under,' our cases clearly treat these two classes of terms differently. See Reynolds & Reynolds Co. [v. King Autos., Inc.], 689 So.2d [1] at 2-3 [(Ala. 1996)]."
782 So.2d at 776-77 n. 1. See also Birmingham News Co. v. Lynch, 797 So.2d 440, 444-45 (Ala.2001), summarizing the holding in Koullas as being that an "arbitration clause referring to disputes or controversies `arising under' an agreement applies only to those claims arising under the terms of the agreement, and does not extend to matters or claims independent of, or merely collateral to, the agreement."
Subsequent to Koullas this Court has also pointed out that
"it is often observed that the words `relating to' in the arbitration context are given a board construction. See Beaver Constr. Co. v. Lakehouse, L.L.C., 742 So.2d 159, 165 (Ala.1999); Reynolds & Reynolds Co. v. King Autos., Inc., 689 So.2d 1 (Ala.1996); Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala. 1994)." *933 Karl Storz Endoscopy-America, Inc. v. Integrated Med. Sys., Inc., 808 So.2d 999, 1013 (Ala.2001).
"This Court has held ... that the phrase `any controversy or claim arising out of or relating to' in arbitration agreements covers a broad range of disputes."
Vann v. First Community Credit Corp., 834 So.2d 751, 754 (Ala.2002). See also Beaver Constr. Co. v. Lakehouse, L.L.C., 742 So.2d 159, 165 (Ala.1999) (`"relatingto' language has been held to constitute a relatively broad arbitration provision").
Likewise, in Bama's Best Housing, Inc. v. Hodges, 847 So.2d 300, 303 (Ala. 2002), we observed:
"[W]e have held that where a contract signed by the parties contains a valid arbitration clause that applies to claims `arising out of or relating to' the contract, that clause has a broader application than an arbitration clause that refers only to claims `rising from' the agreement. See Reynolds & Reynolds Co. v. King Autos., Inc., 689 So.2d 1, 2 (Ala.1996)(citing Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala.1994))."
(Emphasis omitted.) "The `arising out of language was not intended to cover matters or claims independent of, or collateral to, the contract." American Bankers Life Assurance Co. v. Rice Acceptance Co., 709 So.2d 1188, 1191 (Ala.1998)(a three-Justice opinion, with two Justices concurring specially in such a way as to endorse this proposition). See also Ex parte Discount Foods, Inc., 789 So.2d 842, 845 (Ala.2001), and Ex parte Crisona, 743 So.2d 452, 456 (Ala.1999).
In Ex parte Messer, 797 So.2d 1079, 1082-83 (Ala.2001), we made the following observations about the proper interplay between state-law principles of contract interpretation and federal substantive arbitration law:
"`When deciding whether the parties agreed to arbitrate a certain matter ..., courts generally ... should apply ordinary state-law principles that govern the formation of contracts.' First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). In applying general Alabama rules of contract interpretation to the language of an arbitration agreement subject to the FAA, this Court must, in accordance with the federal substantive law on arbitration, resolve any ambiguities as to the scope of the arbitration agreement in favor of arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (Section 2 of the FAA `create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act' and `establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration'). The FAA `simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms,' and `parties are generally free to structure their arbitration agreements as they see fit.' Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 478-79, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Accordingly, `as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.'"
797 So.2d at 1082.
Where the parties have entered into a single written contact and a dispute thereafter develops between them directly arising out of that contract, the requirement in § 2 of the FAA that there be "a controversy thereafter arising out of such contract" *934 is easily determined to have been satisfied. Likewise, the analysis is fairly straightforward as to the alternative provided by § 2 of "a controversy thereafter arising out of such ... transaction" when the contours of the "transaction evidenced by the contract" are distinct and the dispute that develops can confidently be said to arise out of it.
Where, however, the parties have entered into a succession of contractual dealings, extending over the course of several years and involving various "subtransactions," identifying the "controversy" (or, to use the phrase in the arbitration clause at issue, the "controversy, claim, dispute, or disagreement") and determining which, if any, of the contracts it arises out of (or, to use the phrase in the arbitration clause at issue, "arises out of, in connection with, or relates to"), can become problematic. Analyzing the connection and relationship between the subsequently arising controversy and the various earlier contracts and transactions requires first a determination of the nature of the controversy. (Hereinafter we may alternatively substitute "dispute" or "claim" for the FAA's term "controversy," given that the parties here use those first two terms in phrasing their arguments.)
Identification of the "transaction," against the backdrop of a series of contracts and dealings, becomes a function of identification of the dispute. Until one knows what the dispute is, one does not have a frame of reference for analyzing the relationship, if any, between it and the parties' prior transactions and dealings. Where, as here, the dispute has been articulated in a complaint filed to initiate a lawsuit, that statement by the plaintiffs of their claim or claims is essentially determinative, absent an amendment of the complaint or other types of formal submissions altering the statement of the claim or claims. Thus, in the litigation context, the plaintiffs have the opportunity, in the first instance, to define the dispute. They may pursue or forgo available claims as they see fit and select the factual underpinnings they deem pertinent to aver. In this case, the Deeses elected to include within the introductory factual averments of their complaint the following:
"6. On April 16, 1996, the [Deeses] took out a home equity line of credit with AmSouth. [The Deeses] borrowed money on this line of credit....
"7. After repurchasing the [Deeses'] mortgage from Countrywide on March 13, 2001, AmSouth rolled the mortgage into the [Deeses'] equity line of credit. Interest was charged at the higher interest rates and [the Deeses] were charged additional fees and expenses for this transaction.
". . . .
"10. Thereafter, on or about June 1, 2001 [the Deeses] received a billing statement on his equity line of credit with AmSouth reflecting two payments of $51,210.74 leaving his account with a credit of $29,125.76...."
The Deeses then proceeded to state their claims arising out of those facts in the following counts, which included the following numbered paragraph averments:
II. Unlawful Conduct Alleged
"11. As a result of the unlawful conduct of [AmSouth and Countrywide] alleged hereinabove, [the Deeses] have been billed fees, expenses and interest they should not have to pay. The [Deeses'] credit is also being affected by [AmSouth and Countrywide's] wrongful conduct."
III. Breach of Contract
"13. Defendant AmSouth breached its contract with [the Deeses] by wrongfully combining [the Deeses'] *935 mortgage loan into his equity line of credit thereby resulting in a higher interest rate and by wrongfully and unlawfully charging fees and expenses to the [Deeses] to complete the transaction. Defendant Countrywide breached its contract with [the Deeses] by charging late fees, late payments and other charges on their mortgage after it sold the mortgage to AmSouth."
IV. Breach of Fiduciary Duty
"15. Defendant AmSouth breached the fiduciary duty it owed to the [Deeses] by wrongfully combining [the Deeses'] mortgage loan into their equity line of credit thereby resulting in a higher interest rate and by wrongfully and unlawfully charging fees and expenses to the [Deeses] to complete this transaction. Defendant Countrywide breached the fiduciary duty it owed the [Deeses] by charging late fees, late payments, and other charges on their mortgage after it sold the mortgage to AmSouth."
V. Unjust Enrichment
"17. It would be unfair and unjust for [AmSouth and Contrywide] to retain the monies wrongfully collected by them and same should be repaid to the [Deeses]."
VI. Fraud/Suppression/Deceit
"20. [AmSouth and Countrywide] conspired without the knowledge, permission and/or consent of the [Deeses] to sell the [Deeses'] loan with AmSouth to Countrywide Home Loans and then instead of charging the [Deeses'] mortgage payments to said mortgage, combined the amount of the mortgage into the [Deeses'] existing line of credit, charged an increased interest rate as well as additional fees and expenses. AmSouth wrongfully suppressed these material facts from the [Deeses] at all times being under an obligation to communicate these material facts to the [Deeses]. The Defendant, AmSouth, concealed these material facts from the [Deeses] with the intent of deceiving and/or misleading the [Deeses]. Thereafter when the [Deeses] discovered this fraud, [AmSouth and Countrywide] sought to undo what they had done and Countrywide apparently purchased the loan back from AmSouth and began billing the [Deeses] and charging additional fees."
VII. Negligence
"23. [The defendants engaged in negligent conduct by]
"A. Negligently combining the [Deeses'] mortgage into their equity line of credit."
VIII. Wantonness
"26. [The defendants engaged in wanton conduct by]
"A. Wantonly combining the mortgage into the equity line of credit."
As noted, the Deeses take the position that their claims have nothing to do with the credit agreement or the line-of-credit transaction it set in motion, but rather:
"This case is about the Deeses' 20-year, 7% annual interest rate First Mortgage being unilaterally charged by a then Second Mortgage holder's (AmSouth) purchase of the First Mortgage and `rolling' it into the Deeses' higher interest Equity Line."
(Emphasis in original.) AmSouth takes the opposite position, arguing that "[w]hat is disputed in this case is whether AmSouth had the contractual right to combine the First Mortgage and the Equity Line of Credit, when the Deeses were in default on the Equity Line." AmSouth contends that it had that right.
*936 Given the broad language of the arbitration clause ("any controversy, claim, dispute, or disagreement arising out of, in connection with, or relating to this Agreement or your Loan") (emphasis supplied) and the Deeses' expansive statement of their claims in their complaint, we conclude that their dispute with AmSouth does in substantial part arise out of, relate to, and/or has a connection with, the credit agreement and the loan it gave rise to. Not only have the Deeses pleaded claims against AmSouth based on its alleged wrongful "rolling" of the first-mortgage loan into their line-of-credit loan, they have also alleged that AmSouth and Countrywide "conspired" to combine the amount of the first-mortgage indebtedness "into the Plaintiffs' existing line of credit, charg[ing] an increased interest rate as well as additional fees and expenses." We do not view our identification of the transaction to which the dispute relates under the facts of this case as an either/or situation, whereby the dispute can relate exclusively only to either the first-mortgage loan or the line-of-credit loan. The claims put forth by the Deeses relate in part to both of those loans and their contractual underpinnings. Even under the Koullas test, which, as noted, is rightly to be employed only with respect to those arbitration provisions that contain simply the basic phrase "arising under this agreement," the dispute presented by the Deeses "raise[s] some issue that cannot be resolved without a reference to or construction of the [credit agreement] itself." 683 So.2d at 418.

VI. Effect of Subject Transaction on Interstate Commerce

Having concluded that "the dispute" in this case has a sufficient nexus to the credit agreement and the loan transaction it evidences to be fairly said to arise out of, or in connection with, that transaction, or to relate to it, we now turn to an analysis of whether that agreement and/or transaction had a substantial effect on interstate commerce.
In Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000), this Court listed factors to be considered in determining whether a transaction has had a "substantial effect" on interstate commerce. Those factors are: (1) the citizenship of the parties and any affiliation the parties have with out-of-state entities; (2) tools and equipment used in performance of the contract; (3) allocation of the contract price to cost of services and materials involved in performance of the contract; (4) subsequent movement of the object of the contract across state lines; and (5) the degree to which the contract at issue was separable from other contracts that are subject to the FAA. Id. at 765-66. In determining whether a transaction affects interstate commerce, the United States Supreme Court directs that we "consider[] the aggregate effects the transaction has on interstate commerce." Tefco Fin. Co. v. Green, 793 So.2d 755, 759 (Ala. 2001).

1. Citizenship of the parties and any affiliation they might have with out-of-state entities

AmSouth does not dispute that the Deeses are Alabama residents, and it admits in its brief to this Court that it is "an Alabama state-chartered bank." However, as previously noted, the Deeses' complaint presents claims against both AmSouth and Countrywide, a foreign corporation, and asserts that various aspects of the transactions underlying their action involved Countrywide. As also noted earlier, the Deeses' complaint alleges breach of contract, breach of fiduciary duty, unjust enrichment, fraud, suppression, negligence, and wantonness by both AmSouth *937 and Countrywide, stemming from the alleged wrongful handling of the mortgage loan and the line of credit. Importantly, the complaint alleges that a conspiracy between AmSouth and Countrywide to defraud the Deeses in connection with the transaction existed. The Deeses' allegation of a conspiracy between Countrywide and AmSouth will necessitate an analysis of the business dealings between them in the subject transactions. Furthermore, the interrelated nature of the claims asserted against AmSouth and Countrywide in the complaint implicates the entirety of their relationship. Thus, the citizenship-of-the-parties factor, relating to Countrywide's status, lends some support to an argument that the credit agreement evidences a transaction that substantially affects interstate commerce. It does not matter that Countrywide ultimately dismissed its appeal of the denial of its request for arbitration, because we consider only the record the trial court had before it, and Countrywide was a codefendant in the case at all times during the proceedings below.

2. Where the tools and equipment used at the project site originated; and

3. The intrastate versus interstate allocation of cost of services and materials involved in the project

Unlike Sisters of the Visitation, the transaction in this case does not involve any "tools and equipment." This case involves the use of money and the creation of financial obligations. Although the nature of this case blurs the distinction between the consideration of "tools and equipment" and the "allocation of cost of services and materials" factors, AmSouth has provided evidence showing (1) that in determining whether to extend a line of credit to the Deeses, AmSouth obtained a credit bureau report from Equifax, Inc., a Georgia corporation with its principal place of business in Atlanta, Georgia; (2) that AmSouth required in connection with both the original line of credit and its later increase, proof of property insurance, which was provided in the form of a policy issued by State Farm Fire and Casualty Company, an Illinois corporation; (3) that AmSouth purchased a title insurance policy in connection with the credit agreement, and the amended second mortgage, which was issued by Commonwealth Land Title Insurance Company, a Pennsylvania corporation; (4) that AmSouth relied on proof of the existence of a prior mortgage and a statement of the remaining principal balance owing under it, provided by the Texas office of Countrywide, a New York corporation; (5) that in connection with the line of credit, AmSouth obtained a flood-data certification from First American Flood Data Services, Inc., a Texas corporation with its principal place of business in Austin, Texas; and (6) that the Deeses' equityline statements were printed and mailed to them by TSYS in Columbus, Georgia. We have previously held that the procurement of insurance coverages from out-of-state, as a reasonably necessary aspect of a transaction, is properly to be considered in evaluating that transaction's impact on interstate commerce. Chesser v. AmSouth Bank, N.A., 846 So.2d 1082 (Ala.2002). Our consideration in this case of the "tools and equipment" factor and the "allocation of cost of services and materials" factor provides strong support for the conclusion that the credit agreement evidences a transaction that substantially affects interstate commerce.

4. Subsequent movement across state lines

AmSouth argues that the proceeds of a loan are "intrinsically mobile," and that the equity line of credit, unlike a *938 first mortgage, can be used to purchase goods and services in interstate commerce. AmSouth further argues that "on at least three occasions in the past two years, [the Deeses] transferred money electronically from the equity line of credit to a checking account ..., from which they could write checks to purchase goods and services in interstate commerce." Although we agree that the proceeds of a loan are mobile, we reiterate our statement in Alternative Financial Solutions, LLC v. Colburn, 821 So.2d 981 (Ala.2001), that "[a]lthough we agree that loan proceedsmoneysare `mobile,' this language does not stand for the proposition that a loan transaction inherently triggers the FAA." 821 So.2d at 986 (emphasis supplied).
AmSouth asserts that the Deeses used instrumentalities of interstate commerce to perform transactions with respect to the line of credit. In particular, affidavit testimony establishes the following:
"On at least four occasions in the past two years, electronic banking transactions were performed in connection with the Dees Home Equity Line of Credit.... For each of these transactions, the customer accessed the AmSouth electronic banking system using PC Banking (i.e., via a personal computer and modem). The customer used telephone lines to perform these transactions."
Lastly, AmSouth argues that the equity line of credit was a substantial loan, starting at $15,000, extended to $20,000, and subsequently expanded to $72,352.20, in contrast with the loans in Colburn, which involved amounts of less than $300. Additionally, we recognize that AmSouth's purchase of the Deeses' mortgage from Countrywide, an out-of-state corporation, financed by a cash advance of $51,210.74 from the line of credit, is an aspect of the unfolding transactions that necessarily involved interstate commerce. Our consideration of the size of the funds and their movement across state lines provides further support for a conclusion that the credit agreement evidences a transaction that, in its totality, substantially affected interstate commerce.

5. The degree of separability from other contracts

As previously discussed, the Deeses' equity line of credit is interrelated with other contracts. In Brown v. Dewitt, Inc., 808 So.2d 11 (Ala.2001), we stated:
"As noted by this Court in Sisters of the Visitation, the degree of interstate commerce involved in contracts related to the transaction at issue does not determine whether the transaction at issue substantially affects interstate commerce. However, if a finding that the transaction at issue falls outside the reach of the FAA would disrupt the performance of the related contracts or activities that are subject to the FAA, then the degree of interstate commerce involved in those related contracts is to be given greater weight. See Sisters of the Visitation, 775 So.2d at 766-67."
808 So.2d at 14. Here, as in Brown, there is evidence of the procurement of insurance coverage, but, as previously mentioned, there is the additional evidence of a credit report, a flood-data certificate, and accounting and billing services necessary for creating and maintaining the Deeses' line of credit. Thus, we conclude that this final Sisters of the Visitation factor lends some support to a conclusion that the credit agreement evidences a transaction that substantially affects interstate commerce.
Giving due consideration to all of these circumstances, we conclude that AmSouth has shown that the aggregate effect of the credit-line transaction substantially involved interstate commerce.

*939 VII. AmSouth's Right to Compel Arbitration as to Mrs. Dees

Based on the findings and legal conclusions we have expressed thus far, it is clear that Mr. Dees, as a signatory to the credit agreement, is obligated to arbitrate the claims he has asserted against AmSouth. Whether Mrs. Dees is likewise obligated to submit her claims to arbitration requires further analysis.
As noted, she is not a signatory to the credit agreement, but she was a signatory to an associated document which identified her as an "account holder" as to the line-of-credit account. Also, as previously noted, Mr. and Mrs. Dees allege in their complaint that they took out the line of credit and that they borrowed money on it. Mrs. Dees, along with Mr. Dees, alleges a breach of contract in connection with AmSouth's "wrongfully combining Plaintiffs' mortgage loan into his equity line of credit." The rest of the claims and entitlements to damages are asserted equally on her and his behalf. In their brief to this Court, the Deeses take note of Mrs. Dees's status as a nonsignatory only in passing, as follows:
"On April 16, 1996, the [Deeses] entered into an Equity Line of Credit Agreement (`Equity Line') with AmSouth Bank which provided them with a $15,000 line of credit.*
"*Only Leffie Dees, III actually signed the Equity Line of Credit Agreement."
Nonetheless, we are obliged to consider her status because we "will affirm the trial court [as to Mrs. Dees] if its ruling is correct on any valid ground or rationale, even one rejected or not considered by the trial court." Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869, 872 (Ala.1999).
We conclude that Mrs. Dees must submit to arbitration her part of the claims she asserts jointly with her husband against AmSouth. The legal principles dictating that result were well stated in Cook's Pest Control, Inc. v. Boykin, 807 So.2d 524, 526-27 (Ala.2001):
"The first means by which [Mrs. Dees] could be forced to arbitrate her claims against [AmSouth] would be under a theory that she is a third-party beneficiary to the contract. This Court has on several occasions addressed the issue of when a nonsignatory to a contract can be bound by an arbitration agreement contained therein. In Georgia Power Co. v. Partin, 727 So.2d 2 (Ala.1998), an employee sued, alleging negligence, wantonness, and breach of contract against the owner and operators of a loading facility; the trial court refused to enforce an arbitration agreement contained in the contract. This Court stated the general rule that `[i]t is... clear that a third-party beneficiary cannot accept the benefit of a contract, while avoiding the burdens or limitations of that contract.' 727 So.2d at 5. Because the plaintiff had specifically invoked the contract as a basis for his action, he could not avoid certain elements of the contract. Justice Shores, in her dissent, expressed the implicit holding of that case when she wrote that `the plaintiffs could have avoided arbitration by not amending their complaint to state a contract claim.' Id. at 8.
"This Court had earlier analyzed the issue whether a third-party beneficiary could be compelled to arbitrate, in Ex parte Dyess, 709 So.2d 447 (Ala.1997). Because Dyess had sued upon a contract, this Court held that he could not avoid the arbitration clause found therein. We also noted that `"[a] party claiming to be a third-party beneficiary of a contract must establish that the *940 contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental, benefit upon the third party."' Id. at 450 (quoting Weathers Auto Glass, Inc. v. Alfa Mut. Ins. Co., 619 So.2d 1328, 1329 (Ala. 1993)). See also Ex parte Stamey, 776 So.2d 85 (Ala.2000) (holding that the intent of the parties as expressed in the contract determines whether a nonsignatory is a third-party beneficiary).
". . . .
"We recognize a second exception to the general rule that nonsignatories cannot be bound to arbitrate their claims: If a nonsignatory's claims are `intertwined with' and `related to' the contract, arbitration can be enforced. See, e.g., Ex parte Napier, 723 So.2d 49 (Ala. 1998); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753 (11th Cir.1993); Dunn Constr. Co. v. Sugar Beach Condo. Ass'n, Inc., 760 F.Supp. 1479 (S.D.Ala.1991)....
"Our cases recognizing `intertwining claims' as a basis for compelling arbitration have typically involved arbitration clauses broad enough to embrace intertwined claims ... and allegations of a conspiracy between the nonsignatory and the signatory to the arbitration agreement. See Ex parte Isbell, 708 So.2d 571 (Ala.1997)."
As similarly analyzed in Credit Sales, Inc. v. Crimm, 815 So.2d 540, 546 (Ala. 2001), to the extent that Mrs. Dees "bases her claims on another party's contract with the defendants," she cannot "avoid the operation of the arbitration provision of that contract.... [S]he cannot pick and choose which contract provisions she wishes to have benefit her and reject those she does not wish to have bind her; instead, she must accept or reject the entire contract." If Mrs. Dees were to take the position that she is not a party to, and is not bound by any of the terms of, the credit agreement, then she would have no standing to seek damages for the alleged wrongful increase of the indebtedness owing under that agreement or the increase of the interest rate. She does claim damages for those changes in the credit line established by that agreement, however, and therefore must accept the entire contract.

VIII. Unconscionability

We address finally the Deeses' argument in their brief to this Court that the trial court's order denying arbitration must be affirmed because the arbitration clause contained in the credit agreement is unenforceable as a matter of law, because, they say, AmSouth's "conduct" was unconscionable. Unconscionability is a contract defense and does not apply to actions taken outside the ambit of a contract. The defense of unconscionability is codified in Ala.Code 1975, § 5-19-16, which provides:
"With respect to a consumer credit transaction, if the court as a matter of law finds the contract or any provision of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable provision, or it may so limit the application of any unconscionable provision as to avoid any unconscionable result."
See also Harold Allen's Mobile Home Factory Outlet, Inc. v. Butler, 825 So.2d 779, 783 (Ala.2002) ("`While it is true that a court may rescind a contract, or a portion of a contract, for unconscionability, "[r]escission of a contract for unconscionability is an extraordinary remedy usually reserved for the protection of the unsophisticated and uneducated."'") (quoting Layne v. Garner, 612 So.2d 404, 408 (Ala.1992)).
In an attempt to place their unconscionability argument in a contract context, the Deeses contend that AmSouth, by increasing *941 the amount owing under their line of credit, "unilaterally created a new contract, an Equity Line of Credit for $72,352.20." They argue that this new, unilateral contract is unenforceable as unconscionable, and "as the contract is unenforceable then any arbitration clause would also be unenforceable." We cannot agree that the credit agreement has been supplanted by a new contract, as opposed to allegedly having been breached by AmSouth by its unilateral increase of the line-of-credit debt. (Of course, nothing we say in this regard reflects any opinion as to the merits of the dispute between the parties.) The Deeses assert in their complaint, and to this Court on appeal, that AmSouth had no authority to do what it did in connection with the way it handled its acquisition of the first mortgage, by allocating its acquisition cost to the line-of-credit indebtedness, whereas AmSouth asserts that its conduct in that regard was in all respects contractually authorized and proper. We have no need to consider the relative merits of those positions, being concerned at this stage only with the issue whether, as to the dispute so framed by the Deeses in their complaint, AmSouth is entitled to compel arbitration. Being of the opinion that the credit agreement survived intact the alteration of the indebtedness it evidenced, although the Deeses claim it was thereby breached, we likewise conclude that its arbitration clause survives.
There is an independent, and equally compelling, reason the Deeses cannot take advantage of the alleged "unconscionability": they never raised it as an issue in the trial court. Neither in their response to AmSouth's motion to compel arbitration nor at any other time during the proceedings below, at least insofar as is reflected in the record, did they assert unconscionability as a defense to AmSouth's demand for arbitration. "Unconscionability is an affirmative defense, Green Tree Fin. Corp. v. Wampler, 749 So.2d 409, 415 (Ala.1999), and the party asserting the defense bears the burden of proof." Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 281 (Ala.2000). See also Conseco Finance v. Murphy, 841 So.2d 1241 (Ala.2002), and Vann v. First Community Credit Corp., 834 So.2d 751 (Ala. 2002). (Of course, the burden to assert a defense shifts to the party opposing a motion to compel arbitration, only after the movant has properly supported the motion.) The Deeses having failed to raise in any way a defense of unconscionability in the trial court, they cannot now present it for the first time on appeal.

IX. Conclusion

For the reasons stated above, we reverse the order of the trial court denying AmSouth's motion to compel arbitration and remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOUSTON, LYONS, BROWN, WOODALL, and STUART, JJ., concur.
SEE, J., concurs in the result.
MOORE, C.J., and JOHNSTONE, J., dissent.
JOHNSTONE, Justice (dissenting).
I respectfully dissent. The FAA applies only if the particular contract which contains the arbitration agreement substantially affects interstate commerce. 9 U.S.C. § 1 and § 2; Alafabco, Inc. v. Citizens Bank, [Ms. 1010703, August 30, 2002] ___ So.2d ____ (Ala.2002); Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000); and Rogers Found. Repair, Inc. v. Powell, 748 So.2d 869 (Ala. 1999). The particular contract in this case is the equity line of credit agreement. For *942 a substantial effect on interstate commerce, however, the main opinion relies entirely on other distinct contracts and transactions collateral to or even unrelated to the equity line of credit agreement. Therefore, the FAA does not govern this case and does not preempt the Alabama law foreclosing the specific enforcement of arbitration agreements, § 8-1-41(3), Ala. Code 1975.
NOTES
[1] Because of our disposition of this case, we do not address AmSouth's argument relating to the arbitration clause appearing in the Customer Agreement for Depository Account.
[2] Sometime before September 10, 2001, Countrywide apparently had filed a "Joinder" in AmSouth's Motion to Compel Arbitration. This is further indicated by the fact that on October 10, 2001, Countrywide also filed a "Joinder" in AmSouth's brief, stating that it was doing so "in further support of its previously filed Joinder in AmSouth's Motion to Compel Arbitration." Nonetheless, the record does not contain a copy of Countrywide's joinder in AmSouth's motion to compel arbitration.
[3] In its brief to this Court, AmSouth states that the hearing related to both its motion and that of Countrywide. The Deeses state in their brief that the hearing related only to AmSouth's motion. No transcript of the hearing appears in the record and nothing in the record references the scope of the hearing.
[4] On November 26, 2001, Countrywide filed a notice of appeal; it subsequently filed a motion to dismiss that appeal, which was granted on February 5, 2002.
[5] Information in the affidavits relating solely to the effect on commerce of the Customer Agreement for Depository Account is omitted. See note 1. Although the information presented here is compiled from four affidavits, it is presented sequentially.