[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1079 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1080 
Blue Cross Blue Shield of Alabama appeals from the order of the Mobile Circuit Court denying its motion to compel arbitration of claims brought by Elaine M. Rigas in an action against it. We reverse *Page 1081 
the trial court's order denying arbitration and remand the case.
 Facts and Procedural History
In 1995, Blue Cross Blue Shield of Alabama ("Blue Cross") and the Utilities Board of the City of Daphne ("the Board") entered into a contract pursuant to which Blue Cross was to provide the Board's employees, as a fringe benefit of employment, group major-medical insurance coverage. The contract incorporated by reference the Board's application for insurance, the "Utilities Board City of Daphne Group Health Insurance Plan" ("the Plan"), and any future amendment to or revision of the contract or the Plan. In 1997, Blue Cross amended the Plan to add an arbitration provision. Blue Cross provided the group with an insert to be distributed to its members informing them of the addition of the arbitration provision. In 1998, and in each year thereafter, the application for renewal of the contract signed by the Board contained the arbitration provision. The contract and the Plan relevant to this dispute are the contract effective October 1, 1999, and the Plan effective October 6, 2000.
The arbitration provision contained in the Plan appears following the provision describing the procedures for an insured to request a review of a claim and reads as follows:
"ARBITRATION
 "IF YOU ARE STILL NOT SATISFIED WITH THE RESOLUTION OF YOUR COMPLAINT, WE WILL SETTLE THE DISPUTE THROUGH BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND ACCORDING TO THE RULES AND PROCEDURES IN THE AMERICAN ARBITRATION ASSOCIATION'S DISPUTE RESOLUTION PROGRAM FOR ARBITRATION OF INSURANCE CLAIMS DISPUTES. IF YOU REQUEST ARBITRATION, YOU WILL BE PROVIDED A COPY OF THE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION, OR YOU MAY REQUEST A COPY AT ANY TIME BY WRITING TO U.S. AT OUR BIRMINGHAM ADDRESS. YOU HAVE AGREED TO SUBMIT ALL CLAIMS OR GRIEVANCES YOU HAVE THAT ARISE OUT OF, OR ARE IN ANY WAY RELATED TO, THE CONTRACT, INCLUDING ANY CLAIMS YOU MAY HAVE AGAINST PREFERRED OR PARTICIPATING HEALTH CARE PROVIDERS FOR MEDICAL CARE RENDERED PURSUANT TO YOUR CONTRACT, FOR FINAL AND BINDING RESOLUTION BY ARBITRATION. SUBMITTING ALL SUCH CLAIMS TO BINDING ARBITRATION IN EXCHANGE FOR THE INCREASED COVERAGE AND BENEFITS AVAILABLE UNDER THE PREFERRED OR OTHER PARTICIPATING HEALTH CARE PROVIDER CONTRACT PROHIBITS YOU FROM FILING ANY ACTION IN LAW OR EQUITY FOR BREACH OF CONTRACT OR TORT BEFORE THE ARBITRATION AWARD IS MADE. WE WILL PAY ALL COSTS OF ARBITRATION EXCEPT THE COST OF YOUR REPRESENTATION. BUT, IF THE ARBITRATOR FINDS THAT YOU ASKED FOR ARBITRATION WITHOUT A GOOD REASON, HE OR SHE MAY RULE YOU HAVE TO PAY ALL COSTS. THE ARBITRATION WILL BE SET IN THE COUNTY WHERE YOU LIVE UNLESS YOU AND WE AGREE TO ANOTHER PLACE. THE ARBITRATION WILL BEGIN WITHIN 60 DAYS AFTER NOTICE OF ARBITRATION FROM YOU TO *Page 1082 
US OR US TO YOU. ONCE THE ARBITRATION AWARD IS ENTERED, JUDGMENT UPON THE AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. WHILE BLUE CROSS AND BLUE SHIELD OF ALABAMA HAS MADE THIS BINDING ARBITRATION PROCEDURE AVAILABLE TO THE PARTIES, BLUE CROSS AND BLUE SHIELD HAS NO RESPONSIBILITY FOR YOUR SELECTION OF A HEALTH CARE PROVIDER, NOR FOR THE QUALITY OF CARE RENDERED. ANY AWARD MADE AT ANY STAGE OF THE ARBITRATION PROCEEDING IS THE RESPONSIBILITY OF THE HEALTH CARE PROVIDER AND NOT OF BLUE CROSS AND BLUE SHIELD. UNDER THE FEDERAL ARBITRATION ACT, AWARD SHALL NOT BE SET ASIDE EXCEPT UPON THE GROUNDS IN THE FEDERAL ARBITRATION ACT."
(Capitalization in original.)
In 1995, Rigas's father, an employee of the Board, applied for family coverage under the Plan. His application acknowledges:
 "My application is subject to terms and conditions of the agreement between my Group (my employer or other organization through which I am applying for coverage) and you (Blue Cross and Blue Shield of Alabama)."
Blue Cross accepted Rigas's father's application for family coverage, and Rigas was enrolled as her father's dependent under the Plan from February 1, 1995, until September 1, 2001, when she was no longer eligible for dependent coverage. At that time, Rigas's father applied for continuation of coverage for Rigas pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The COBRA coverage was subject to all of the terms and conditions of the Plan.[1] Rigas was covered by the Plan through COBRA from September 1, 2001, until February 1, 2003.
In January 2002 Rigas underwent two surgeries. Blue Cross denied claims for payment for the surgeries. In September 2003, the medical bills related to Rigas's surgeries remained unpaid, and Providence Hospital sued Rigas for the unpaid medical bills. When Rigas answered Providence Hospital's complaint,[2] she also filed a third-party complaint asserting claims against Blue Cross, as well as claims against her health-care providers.
Blue Cross moved to compel arbitration of Rigas's claims against it and to stay the litigation pending arbitration. Rigas opposed the motion. After a hearing, the trial court denied Blue Cross's motion to compel arbitration. Blue Cross appeals.
 Issues
Blue Cross argues that the trial court erred in denying its motion to compel arbitration *Page 1083 
because, it argues, Blue Cross proved the existence of a contract calling for arbitration and Rigas did not show that the arbitration provision in that contract is not valid or does not apply in this case. Rigas argues that Blue Cross did not prove the existence of a contract calling for arbitration and, alternatively, that the arbitration provision is not valid.
 Standard of Review
"`[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party is a de novo determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review.' Ex parte Roberson, 749 So.2d 441, 446 (Ala. 1999). Furthermore:
 "`A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id.
"After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question."'
 "Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala. 2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (emphasis omitted))."
Vann v. First Cmty. Credit Corp., 834 So.2d 751, 752-53 (Ala. 2002).
 Discussion
Blue Cross, in moving to compel arbitration, had the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce.[3] See Vann v. First Cmty. CreditCorp., 834 So.2d at 752-53.
In First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938,944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995), the Supreme Court of the United States held that courts should enforce an arbitration agreement when there is "`clear and unmistakabl[e]' evidence that" the parties agreed to arbitrate their dispute. The Federal Arbitration Act creates a strong presumption in favor of arbitration. "The [Federal] Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. MercuryConstr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765
(1983). While, "as with any other contract, the parties' intentions control, . . . those intentions are generously construed as to issues of arbitrability." Mitsubishi MotorsCorp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626,105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).
Blue Cross argues that the Plan under which Rigas seeks payment of medical-insurance benefits undisputedly contains an arbitration provision. Blue Cross points to the arbitration provision quoted above, which is contained in the Plan and which was effective at the time of Rigas's *Page 1084 
surgeries and under which Rigas seeks benefits. Rigas, on the other hand, argues that the Plan does not clearly call for arbitration. She points to the following sentence, which is included in the Plan:
 "If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court."
The single sentence to which Rigas points appears in the following paragraph, which is located in the section of the Plan entitled "Statement of ERISA Rights":[4]
 "In addition to creating rights of plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employees benefit plan. The people who operate your plan, called `fiduciaries' of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have a plan review and reconsideration of your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file a suit in federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in federal court."
Rigas argues that "[w]here contradictory language regarding arbitration raises a `legitimate doubt' as to whether the parties agreed to arbitration, the question of arbitrability is to be resolved by the fact-finder." Rigas's brief at p. 36 (citing Exparte Mountain Heating Cooling, Inc., 867 So.2d 1112 (Ala. 2003)). Rigas contends that the single sentence — "If you have a claim for benefits which is denied or ignored . . . you may file suit in a state or federal court" — that appears in the "Statement of ERISA Rights" in the Plan casts doubt on whether the parties agreed to arbitrate.
In Ex parte Mountain Heating Cooling, Inc., this Court considered Mountain Heating's argument that the contract as a whole, and the arbitration provision contained in the contract, created an ambiguity as to whether the parties agreed to arbitrate. The main opinion in that case stated:
 "`"If there is doubt as to whether such an agreement [to arbitrate] exists, the matter, upon a proper and timely demand, should be submitted to a jury. *Page 1085 
Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement."'"
867 So.2d at 1115 (quoting Allstar Homes, Inc. v. Waters,711 So.2d 924, 929 (Ala. 1997), quoting in turn Shearson LehmanBros. v. Crisp, 646 So.2d 613, 616 (Ala. 1994)). The main opinion then examined whether the contract was ambiguous and whether there was, therefore, doubt as to whether the parties had agreed to arbitrate their disputes. The main opinion concluded that "[t]he wording of the arbitration provision and the changes made to the contract [outside the arbitration provision] raise legitimate doubts as to whether the parties agreed to arbitrate their disputes." 867 So.2d at 1118. This Court reversed the trial court's order compelling arbitration. 867 So.2d at 1118. However, in Mountain Heating, only three Justices concurred in the full opinion, four Justices concurred in the result, and one Justice dissented.[5] Thus, Mountain Heating is of no precedential value. Nevertheless, we will consider Rigas's argument that, as to whether the parties agreed to arbitrate, the Plan is ambiguous.
Mountain Heating had argued that both the arbitration provision itself and the other provisions of the contract created the ambiguity as to arbitration; Rigas, however, does not contend that the arbitration provision itself creates ambiguity as to whether the parties agreed to arbitrate. Instead, Rigas contends that the single sentence contained within the Plan's "Statement of ERISA Rights" gives rise to such an ambiguity.
 "The determination of whether a contract is ambiguous is a question of law for the court, the burden being upon the party claiming that ambiguity exists to show the necessary indefiniteness of meaning. In determining whether a contract is ambiguous, the court begins with its plain language, construed in harmony with the plain and generally accepted meaning of the words used, with reference to all of the agreement's provisions."
11 Richard A. Lord, Williston on Contracts § 30:5 at 64-67 (4th ed. 1990) (footnotes omitted). We have said that a contractual provision "is ambiguous if it `is reasonably susceptible [of] more than one meaning.'" Alfa Mut. Ins. Co. v. Nationwide Mut.Ins. Co., 684 So.2d 1295, 1299-1300 (Ala. 1996) (quoting Filesv. Variety Wholesalers, Inc., 554 So.2d 1068, 1069 (Ala.Civ.App. 1989)).
In examining the Plan as a whole, with reference to all of its provisions, we conclude that the single sentence in the "Statement of ERISA Rights" to which Rigas points does not create an ambiguity as to whether the parties agreed to arbitrate. The parties unambiguously expressed their agreement to arbitrate at least some of their future disputes.[6] Parties may agree to arbitrate fewer than all of their disputes. The inclusion in the Plan of the "Statement of ERISA Rights," which may allow claims asserted under ERISA to be litigated instead of arbitrated, does not render ambiguous the clear language located in the section of the Plan addressing review of claims. The Federal Arbitration Act creates a strong presumption in favor of arbitration, and any doubts *Page 1086 
concerning the scope of arbitrable issues should be resolved in favor of arbitration, "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H.Cone Mem'l Hosp., 460 U.S. at 24-25, 103 S.Ct. 927. Rigas's allegations do not create an ambiguity that overcomes this presumption.
When Blue Cross met its burden of showing the existence of an agreement to arbitrate,[7] the burden then shifted to Rigas to present evidence indicating that the arbitration provision is not valid or that it does not apply to the dispute in question.See Vann v. First Cmty. Credit Corp., 834 So.2d 751 at 752-53. Rigas argued to the trial court that the arbitration provision is not valid because, she argued: (1) it is unconscionable, (2) the arbitration rules under which the provision says arbitration is to be conducted preclude arbitration of her claim, and (3) Blue Cross had waived its right to compel arbitration.
 Unconscionability
"[T]here is nothing inherently unfair or oppressive about arbitration clauses," Coleman v. Prudential Bache Sec., Inc.,802 F.2d 1350, 1352 (11th Cir. 1986), and arbitration agreements are not in themselves unconscionable, Ex parte McNaughton,728 So.2d 592, 597-98 (Ala. 1998). Instead, unconscionability is an affirmative defense, and the party asserting the defense bears the burden of proving unconscionability. Conseco Fin. v.Murphy, 841 So.2d 1241, 1245 (Ala. 2002).
This Court has stated that "`[a]n unconscionable . . . contractual provision is defined as a . . . provision "such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other."'"Southern United Fire Ins. Co. v. Howard, 775 So.2d 156, 163
(Ala. 2000) (quoting Layne v. Garner, 612 So.2d 404, 408 (Ala. 1992), quoting in turn Lloyd v. Service Corp. of Alabama,453 So.2d 735, 739 (Ala. 1984), and Hume v. United States,132 U.S. 406, 410, 10 S.Ct. 134, 33 L.Ed. 393 (1889)). In Layne v.Garner, this Court set out four factors it considered important in determining whether a contract was unconscionable:
 "In addition to finding that one party was unsophisticated and/or uneducated, a court should ask (1) whether there was an absence of meaningful choice on one party's part, (2) whether the contractual terms are unreasonably favorable to one party, (3) whether there was unequal bargaining power among the parties, and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract."
612 So.2d at 408.
This Court has also recognized a distinction between "substantive unconscionability" and "procedural unconscionability" and categorized the above factors as either substantive or procedural. Substantive unconscionability
 "`relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties *Page 1087 
otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the non-drafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction.'"
Ex parte Thicklin, 824 So.2d 723, 731 (Ala. 2002) (emphasis omitted) (quoting Ex parte Foster, 758 So.2d 516, 520 n. 4 (Ala. 1999), quoting in turn 8 Richard A. Lord, Williston onContracts § 18:10 (4th ed. 1998)). See also Leeman v. Cook'sPest Control, Inc., 902 So.2d 641 (Ala. 2004).
Procedural unconscionability, on the other hand, "deals with `procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter into the transaction.'" Thicklin, 824 So.2d at 731 (quoting Foster,758 So.2d at 520 n. 4, quoting in turn 8 Williston on Contracts
§ 18:10).
To avoid an arbitration provision on the ground of unconscionability, the party objecting to arbitration must show both procedural and substantive unconscionability. "[A] finding of a procedural abuse, inherent in the formation process, must be coupled as well with a substantive abuse." 8 Williston onContracts § 18:10 at 62.
 a. Procedural unconscionability
Rigas argues that the arbitration provision in the Plan is procedurally unconscionable because, she says, Blue Cross had overwhelming bargaining power — she had no meaningful choice as to whether and how to enter into the contract containing the arbitration provision. Rigas was able to contract with Blue Cross for insurance coverage only because the Board had contracted with Blue Cross; Blue Cross, therefore, urged the trial court, and urges us, to consider procedural unconscionability in terms of the formation of the contract between the Board and Blue Cross, rather than the formation of the contract between Rigas and Blue Cross. Blue Cross states that Rigas's "unconscionability argument ignores the overriding fact that the Plan was for group insurance, negotiated and accepted by the Board and offered to its employees as a benefit of employment." Blue Cross's brief at p. 36. Rigas does not respond to Blue Cross's assertion that we should analyze unconscionability in this manner. Nonetheless, whether we view the Plan from the perspective of the parties who negotiated it — Blue Cross and the Board — or from the perspective of Rigas, who chose to take the benefits of those negotiations, we conclude that the arbitration provision is not procedurally unconscionable.
We have said that "[a] primary indicium of unconscionability in the modern consumer-transaction context is whether the consumer has the ability `to obtain the product made the basis of [the] action' without signing an arbitration clause." American Gen.Fin., Inc. v. Branch, 793 So.2d 738, 750 (Ala. 2000) (quotingGreen Tree Fin. Corp. v. Wampler, 749 So.2d 409, 415 (Ala. 1999)). In determining whether an arbitration agreement is procedurally unconscionable, we have looked at whether the consumer could obtain the product from the vendor or from another vendor without agreeing to an arbitration provision. See, e.g.,Leeman v. Cook's Pest Control, 902 So.2d 641, and Branch,793 So.2d at 750. The burden of demonstrating that the product cannot be obtained without signing an arbitration agreement is on the party asserting unconscionability. Leeman v. Cook's PestControl, 902 So.2d at 645 ("unconscionability is an affirmative defense, and the party asserting *Page 1088 
the defense bears the burden of proof" (citing Conseco Fin. v.Murphy, 841 So.2d 1241, 1245 (Ala. 2002))).
Rigas did not show that the arbitration provision in the Plan is procedurally unconscionable with respect to the contract between Blue Cross and the Board, which incorporated the Plan. In particular, Rigas presented no evidence indicating that the Board lacked a meaningful choice as to whether to enter into the contract with Blue Cross and presented no evidence indicating that the Board lacked a meaningful choice as to the terms of the contract. The Board presumably had a meaningful choice as to whether to enter into the contract, and hence the Plan, with Blue Cross. Before 1995, the health insurance for the Board's employees was provided by the City of Daphne; the Board's human resources officer indicated that the Board had received proposals from other companies that wanted to provide health-insurance coverage.
In Leeman v. Cook's Pest Control, the Leemans argued that they had "no meaningful choice" in entering into a contract containing an arbitration provision — a termite-control agreement — because, they said, they could not obtain a similar termite-control agreement from another provider without assenting to an arbitration agreement and because they were unable to negotiate with Cook's Pest Control to remove the arbitration provision from the termite-control agreement. We held that the Leemans could not demonstrate that they had had no meaningful choice and that the arbitration provision was therefore procedurally unconscionable, because they had not attempted to secure a termite-control agreement from another service provider and they had not attempted to negotiate the terms of the termite-control agreement with Cook's Pest Control.902 So.2d at 646-48. The evidence indicates that the Board did not attempt to secure from another health-insurance provider a group policy that did not include an arbitration provision.[8] See Leeman v.Cook's Pest Control, 902 So.2d at 647 ("it is difficult to conclude that the Leemans lacked a meaningful choice . . . when in fact they never undertook to actually make a choice" in that they did not attempt to secure a termite-control agreement from another service provider). Moreover, the evidence indicates that the Board did not attempt to negotiate with Blue Cross to have the arbitration provision deleted from the Plan.[9] Thus, we conclude that, as to the *Page 1089 
Board, the arbitration provision has not been shown to be procedurally unconscionable.
Rigas argues that she had no meaningful choice in whether and under what terms to enter into the contract with Blue Cross.[10] Rigas argues that, at the time she obtained COBRA coverage to continue participating in the Plan, it was her "only realistic option for medical insurance." Rigas's brief at p. 28 (emphasis added). Rigas states that she "had to have health insurance without interruption" because otherwise she would incur costs to treat an existing illness. She states that, because of her illness, she could maintain only part-time employment and her employer offered no medical insurance coverage to part-time employees; thus, she continued her coverage through her father's employer, the Board. In addition, Rigas asserts that she could not secure an individual policy, rather than a group policy, because, she says, individual policies are expensive and her preexisting medical condition created an "obstacle" to her obtaining coverage without a waiting period. Rigas also points out the many other advantages of group coverage, like she had with Blue Cross, over individual coverage: group policies are subject to HIPAA (Health Insurance Portability and Accountability Act) guidelines, which allow an insured to move coverage from one policy to another without a waiting period; group policies are covered by COBRA, which allows an insured to continue coverage for a period after the insured is no longer eligible under a group's plan; and group policies generally provide more extensive coverage than an individual policy. From these assertions, Rigas concludes that, from September 2001 to January 2002, she had "no meaningful choice" but to continue her coverage under the Plan through COBRA.[11] Rigas's contentions do not suggest that she was unable to obtain the product offered by Blue Cross from another health-insurance provider without agreeing to an arbitration provision; instead, her argument indicates only that the Blue Cross coverage through COBRA was the best insurance available to her at the time, in terms of both cost and coverage. The simple fact that the insurance policy that contained the arbitration provision is the best insurance policy available to the insured does not make the arbitration provision in the policy unconscionable. Moreover, as Blue Cross argues, it is impossible to conclude that Rigas lacked to meaningful choice because she in fact never undertook to make a choice. Her father secured coverage for her without any input from her whatever. She simply accepted the plan her father provided for her. Rigas testified: "I didn't even know I was applying for the COBRA coverage."
Rigas also complains that she was unable to negotiate with Blue Cross to remove *Page 1090 
the arbitration provision from the Plan. She asserts that there is "no dispute" that individual employees and their dependents do not have the ability to negotiate policy terms with Blue Cross separate from the terms the Board negotiated. Yet, Rigas offered no evidence that she ever attempted to have Blue Cross remove the arbitration provision from the Plan, as it applied to her, or that she attempted to persuade the Board to negotiate with Blue Cross to remove the arbitration provision from the Plan.
We cannot conclude that Rigas had "no meaningful choice" as to whether to enter into the contract that contained an arbitration provision — the Plan — because Rigas has presented no evidence indicating that she was unable to, or even attempted to, secure a health-insurance policy with another company that would not include an arbitration provision or that she attempted to negotiate with Blue Cross or with the Board for the removal of the arbitration provision from the Plan.
As we noted above, in order to avoid an arbitration provision on the ground of unconscionability, the party objecting to the provision must show both procedural and substantive unconscionability. Although we have concluded that Rigas has not demonstrated procedural unconscionability, we nevertheless address Rigas's argument that the arbitration is substantively unconscionable.
 b. Substantive unconscionability
Rigas argues that the arbitration provision is substantively unconscionable because, she says, its terms are grossly favorable to Blue Cross. Specifically, Rigas contends (1) that the arbitration provision provides Blue Cross with absolute immunity from liability for any arbitration award; (2) that the arbitration provision unfairly allows Blue Cross to recover "`all costs,' which could include attorneys fees, against her, but prohibits Rigas from recovering her costs or attorneys fees under any circumstances," Rigas's brief at p. 27; and (3) that the arbitration provision allows Blue Cross to proceed against her in court while requiring her to arbitrate her claims against Blue Cross. None of Rigas's arguments persuade us that the arbitration provision included in the Plan is substantively unconscionable.
Rigas argues that the arbitration provision is grossly favorable to Blue Cross because, she says, the arbitration provision contains a "blanket exculpatory clause eliminating any possibility of recovery" from Blue Cross. Rigas's brief at p. 20. Rigas points to the following sentence in the arbitration provision:
 "ANY AWARD MADE AT ANY STAGE OF THE ARBITRATION PROCEEDING IS THE RESPONSIBILITY OF THE HEALTH CARE PROVIDER AND NOT OF BLUE CROSS AND BLUE SHIELD."
(Capitalization in original.)
Blue Cross responds that this sentence should be construed in conjunction with the remainder of the arbitration provision and that the sentence shields Blue Cross from liability for arbitration awards against a health-care provider only, not from arbitration awards against Blue Cross. Indeed, the sentence about which Rigas complains, in context, reads as follows:
 "WHILE BLUE CROSS AND BLUE SHIELD OF ALABAMA HAS MADE THIS BINDING ARBITRATION PROCEDURE AVAILABLE TO THE PARTIES, BLUE CROSS AND BLUE SHIELD HAS NO RESPONSIBILITY FOR YOUR SELECTION OF A HEALTH CARE PROVIDER, NOR FOR THE QUALITY OF CARE RENDERED. ANY AWARD MADE AT *Page 1091 
ANY STAGE OF THE ARBITRATION PROCEEDING IS THE RESPONSIBILITY OF THE HEALTH CARE PROVIDER AND NOT OF BLUE CROSS AND BLUE SHIELD."
(Capitalization in original.) The sentence about which Rigas complains could indicate more clearly than it does that it applies only to arbitration awards against health-care providers; however, when read in context the sentence may properly be read as applying only to arbitration awards against health-care providers.[12] "Under . . . established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms." Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746
(Ala. 2000). We conclude that the arbitration provision does not contain "a blanket exculpatory clause eliminating any possibility of recovery" from Blue Cross, as Rigas argues. Thus, the sentence she points to does not render the arbitration provision substantively unconscionable.
Rigas also complains that the arbitration provision is substantively unconscionable because, she says, the arbitration provision unfairly allows Blue Cross to recover "`all costs,' which could include attorneys fees, against her, but prohibits Rigas from recovering her costs or attorneys fees under any circumstances." Rigas's brief at p. 27. Rigas points to the following provision:
 "WE [Blue Cross] WILL PAY ALL COSTS OF ARBITRATION EXCEPT THE COST OF YOUR REPRESENTATION. BUT, IF THE ARBITRATOR FINDS THAT YOU ASKED FOR ARBITRATION WITHOUT A GOOD REASON, HE OR SHE MAY RULE YOU HAVE TO PAY ALL COSTS."
(Capitalization in original.)
We cannot agree with Rigas's interpretation of the quoted language. The language clearly contemplates that Blue Cross will pay "all costs of arbitration" unless the arbitrator finds that Rigas asked for arbitration without a good reason. In that case, the arbitrator "may" require Rigas to pay the costs of arbitration. The arbitration provision is silent as to whether Rigas or Blue Cross may have to pay the costs of the other party's representation. We cannot conclude that this language renders the arbitration provision substantively unconscionable.
Rigas also complains that the arbitration provision requires her claims to be resolved in arbitration but would allow Blue Cross to litigate any claims it may have against her in court. Her mutuality-of-remedy argument is simply erroneous. We have held:
 "`The doctrine of mutuality of remedy is limited to the availability of the ultimate redress for a wrong suffered by a plaintiff, not the means by which that ultimate redress is sought. A plaintiff does not seek as his ultimate redress an arbitration proceeding or a court proceeding. Instead, he seeks legal relief (e.g., damages) or equitable relief (e.g., specific performance) for his injury, and he uses the proceeding as a means to obtain that result.'"
Green Tree Fin. Corp. of Alabama v. Vintson, 753 So.2d 497, 504
(Ala. 1999) (quoting Ex parte McNaughton, 728 So.2d 592, 598
(Ala. 1998)). Rigas's argument is without merit. *Page 1092 
Rigas has not shown that the arbitration provision is procedurally and substantively unconscionable. She has not shown that either she or the Board lacked a meaningful choice as to whether to enter into the Plan with Blue Cross and as to the terms of the Plan, and she has not shown that the terms of the arbitration provision are grossly favorable to Blue Cross.
 Procedural Defects
Rigas also argues that the arbitration provision is unenforceable because, she says, the rules adopted by Blue Cross in the arbitration provision itself prohibit arbitration of her claims. The relevant portion of the arbitration provision states:
 "IF YOU ARE STILL NOT SATISFIED WITH THE RESOLUTION OF YOUR COMPLAINT, WE WILL SETTLE THE DISPUTE THROUGH BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND ACCORDING TO THE RULES AND PROCEDURES IN THE AMERICAN ARBITRATION ASSOCIATION'S DISPUTE RESOLUTION PROGRAM FOR ARBITRATION OF INSURANCE CLAIMS DISPUTES. . . ."
(Capitalization in original.)
Rigas alleges that the "Health Care Policy Statement" of the American Arbitration Association ("AAA") in place in January 2003 precludes the AAA from handling the arbitration of this case and, further, otherwise precludes the arbitration of her case. That statement of the AAA reads, in pertinent part:
 "As a result of a review of its caseload in the health care area, the [AAA] has announced that it will no longer accept the administration of cases involving individual patients without a post-dispute agreement to arbitrate."
As Blue Cross notes, the arbitration provision in this case does not indicate that the arbitrator who arbitrates the dispute must be an AAA arbitrator. The Health Care Policy Statement indicates only that the AAA will not accept administration of certain cases; it does not preclude arbitration of Rigas's claims by a non-AAA arbitrator. Even if we were to accept Rigas's argument that the arbitration provision requires arbitration by an AAA arbitrator and that the AAA's Health Care Policy Statement precludes the AAA from providing an arbitrator, we would not be compelled to hold that Blue Cross's motion to compel arbitration was due to be denied on that basis. "[W]here the arbitrator named in the arbitration agreement cannot or will not arbitrate the dispute, a court does not void the agreement but instead appoints a different arbitrator." Ex parte Warren, 718 So.2d 45, 48
(Ala. 1998).
The arbitration provision provides that arbitration of Rigas's claims will be conducted "according to" the "rules and procedures" of the AAA's "dispute resolution program for arbitration of insurance claims disputes." Rigas argues that the AAA has determined that claims such as Rigas's are no longer subject to arbitration and, thus, the adoption of the AAA rules regarding health-insurance disputes encompasses the AAA's determination that claims such as Rigas's are not subject to arbitration. We cannot agree with Rigas's interpretation. As we noted above, the statement of the AAA provides only that the AAA will not administer a dispute such as this one; it does not provide that Rigas's claims are not arbitrable.
 Rigas's Waiver Argument
Finally, Rigas argues that Blue Cross waived its right to arbitration because, she says, it did not furnish her a copy of the claims-review procedure, as required by *Page 1093 
the contract between Blue Cross and the Board, and, she says, Blue Cross did not comply with the claims-review process set out in the Plan.[13] Blue Cross contends that the claims-review procedure was available to Rigas through the Board and through Rigas's father and that she was further informed how to proceed with the claims-review procedure in a telephone conversation with a Blue Cross customer representative. In addition, Blue Cross argues that it was Rigas who failed to follow the proper claims-review procedure. To request review of a claim made under the Plan, an insured is to "[s]end a written request" to Blue Cross's Birmingham address. Rigas confirmed in her deposition that she had been informed of the procedure by the Blue Cross representative and that she had not followed that claims-review procedure.
"`[T]here is a presumption against a court's finding that a party has waived the right to compel arbitration.'" Lee v. YESof Russellville, Inc., 784 So.2d 1022, 1028 (Ala. 2000) (quotingEastern Dredging Constr., Inc. v. Parliament House, L.L.C.,698 So.2d 102, 103 (Ala. 1997)). A party seeking to prove a waiver of a right to arbitrate carries a heavy burden, and the courts will not lightly infer a waiver of the right to compel arbitration. Lee, 784 So.2d at 1028-29 (citing MutualAssurance, Inc. v. Wilson, 716 So.2d 1160 (Ala. 1998)). Doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H.Cone Mem'l Hosp., 460 U.S. at 24-25, 103 S.Ct. 927.
Rigas's allegation that Blue Cross did not comply with the clams-review process is not supported by the record; the record in fact indicates that Rigas did not properly initiate the process. Moreover, her allegation that Blue Cross did not comply with the process does not overcome her heavy burden to prove that Blue Cross waived its right to arbitrate.
 Conclusion
We conclude that Rigas did not meet her burden of showing that the arbitration provision included in the Plan is unenforceable or inapplicable. The arbitration provision is neither substantively nor procedurally unconscionable; arbitration of Rigas's claims is not precluded by the language of the arbitration provision indicating that the arbitration will be conducted under certain rules of the AAA; and Blue Cross did not waive its right to arbitration. Thus, the trial court erred in denying Blue Cross's motion to compel arbitration. We therefore reverse the trial court's order denying Blue Cross's motion to compel arbitration and remand this case for the trial court to enter an order granting Blue Cross's motion to compel arbitration.
REVERSED AND REMANDED WITH DIRECTIONS.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] The COBRA application states:
 "While I continue the benefits provided by this group, these benefits are subject to all terms and conditions of the contract or agreement between the Employer [the Utilities Board of the City of Daphne] and Blue Cross Blue Shield of Alabama. My benefits and/or rates will change when this Employer's benefits change, and will end if the Employer's coverage is cancelled at the same time benefits for active employees of the Employer end, regardless of whether I have continued to pay for my coverage."
[2] Rigas did not answer the complaint within the time prescribed by the Alabama Rules of Civil Procedure. Thus, a default judgment was entered against her. The default judgment, however, was set aside, the case proceeded, and Rigas subsequently answered the complaint.
[3] No one disputes that the contract at issue here evidences a transaction affecting interstate commerce.
[4] Blue Cross explains that it is required to include this language in all insurance plans that might fall under the ERISA guidelines. Blue Cross asserts that the "Statement of ERISA Rights" is inoperative in this case because governmental plans are exempt from ERISA requirements, but it includes the "Statement of ERISA Rights" even in plans such as the Board's that are likely not covered by ERISA in order not to risk violating federal law.
[5] The votes in the per curiam opinion were: Moore, C.J., and Houston and Johnstone, JJ., concurred; Brown, Harwood, Woodall, and Stuart, JJ., concurred in the result; and See, J., dissented.
[6] Rigas does not contend that the dispute underlying this appeal falls outside of the disputes contemplated by the arbitration provision.
[7] Although the trial court did not enter an order explaining its basis for denying Blue Cross's motion to compel arbitration, the transcript from the hearing indicates that the trial court concluded that Blue Cross had met its initial burden.
[8] The Board's human resources officer testified:
 "Q. From time to time, do you — does [the Board] ever shop insurance coverage to see about maybe moving the coverage to another carrier besides Blue Cross and Blue Shield?
"A. We haven't since I've been there.
"Q. Since '95?
"A. Right.
 "Q. You've not obtained any proposals or looked at any other options besides Blue Cross and Blue Shield?
 "A. We have not entertained any other proposals, but we have had proposals submitted to us.
". . . .
 "Q. Were they reviewed by anyone at the Utilities Board?
"A. No.
 "Q. Why haven't y'all even considered another insurance company?
 "A. Well, I really can't say, other than the fact that we've had Blue Cross Blue Shield and their benefits and we've always had success with Blue Cross Blue Shield so I wouldn't have a reason. If something's not broke, don't worry about trying to fix it pretty much. It's been a good carrier."
[9] The Board's human resources officer, who administers the Plan, testified as follows in her deposition:
 "Q. And to your knowledge, have you or anyone else at [the Board] ever asked Blue Cross to take the arbitration provision out of the contract?
"A. Not that I'm aware of."
[10] Rigas's argument goes not to the validity of the arbitration provision, but to the validity of the entire contract. See Green Tree Fin. Corp. of Alabama v. Wampler,749 So.2d 409, 414 (Ala. 1999) (holding that a charge of unconscionability was directed to the contract as a whole where the plaintiffs claimed "that they were forced to sign [the contract] because of `tremendous economic duress' arising from a combination of sales pressure concerning the impending deadline on the availability of a no-money-down payment plan and what they describe as their limited financial condition").
[11] Blue Cross asserts that Rigas could have obtained individual coverage through the Alabama Health Insurance Plan ("AHIP"). But, Rigas says, she would not have qualified for coverage under AHIP until her COBRA coverage was exhausted, which was after her January 2002 surgeries. In addition, Rigas says, an individual policy under AHIP would have been 40 percent more expensive than other policies in the market.
[12] The issue whether Rigas's claims against her health-care providers are subject to the arbitration provision in the Plan is not before us.
[13] Rigas also argues that the inclusion of the previously addressed litigation language contained in the "Statement of ERISA Rights" constituted a waiver of the right to compel arbitration. However, just as we do not construe that language to create an ambiguity as to whether the Plan contained an agreement to arbitrate, we do not construe that language to constitute a waiver of the right to arbitrate. *Page 1094