Sam J. Carroll III and GOCO Acquisition Corporation, the defendants in the underlying action, appeal the trial court's order denying their motion to compel arbitration. We affirm the trial court's order.
 Facts and Procedural History
On July 31, 1998, Sam J. Carroll III, James W. Jackson ("Bill Jackson"), and Robert W. Jackson ("Warren Jackson") formed CJJ, Inc., to acquire, own, manage, and sell various businesses related to convenience stores. At that time, Bill Jackson and Warren Jackson were principals in W.L. Petrey Wholesale Company, Inc. ("Petrey Wholesale"); Carroll was a director and employee of Petrey Wholesale. In forming CJJ, Carroll, Bill Jackson, and Warren Jackson executed articles of incorporation, bylaws, and a shareholders agreement ("the shareholders agreement"). Among other things, the shareholders agreement restricts the transfer of CJJ stock to third parties, provides a procedure for transferring shares of CJJ stock among the existing shareholders (Carroll, Bill Jackson, and Warren Jackson), and includes an arbitration clause.[1] Neither the articles of incorporation nor the bylaws contain an arbitration clause, and those documents do not purport to incorporate by reference the arbitration clause or any other provision of the shareholders agreement.
In October 2004, Bill Jackson, Warren Jackson, Petrey Wholesale, and CJJ (collectively "the plaintiffs") sued Carroll. *Page 236 
They also named as a defendant GOCO Acquisition Corporation ("GOCO"), which Carroll had formed in 1999 to purchase 15 convenience stores, and P C Grocers, Inc., to which Carroll eventually sold 9 of those 15 stores. The facts giving rise to the dispute are discussed in detail below. Carroll and GOCO, pointing to the arbitration clause in the shareholders agreement, moved the trial court to compel the plaintiffs to arbitrate all of their disputes against Carroll and GOCO.[2]
The trial court found that the complaint
 "reveals that the lawsuit does not involve, either directly or indirectly, any claim of a violation of the Shareholders Agreement, the disposition of shares in CJJ, or the breach of any duties or limitations created by the Shareholders Agreement or implied by law merely as a result of Sam Carroll's status as a CJJ shareholder."
Accordingly, the trial court denied Carroll and GOCO's motion to compel arbitration. Carroll and GOCO appeal.
 Standard of Review "`"[T]he standard of review of a trial court's ruling on a motion to compel arbitration at the instance of either party is a de novo
determination of whether the trial judge erred on a factual or legal issue to the substantial prejudice of the party seeking review." Ex parte Roberson, 749 So.2d 441, 446 (Ala. 1999). Furthermore:
 "`"A motion to compel arbitration is analogous to a motion for summary judgment. TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. Id. `After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.'"
 "`Fleetwood Enters., Inc. v. Bruno, 784 So.2d 277, 280 (Ala. 2000) (quoting Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995) (emphasis omitted)).'
 "Vann v. First Cmty. Credit Corp., 834 So.2d 751, 752-53 (Ala. 2002)."
Blue Cross Blue Shield of Alabama v. Rigas,923 So.2d 1077, 1083 (Ala. 2005).
 Discussion
Carroll and GOCO rely on the arbitration clause in the shareholders agreement to attempt to compel arbitration of the plaintiffs' disputes. The shareholders agreement is the only agreement in the record that contains an arbitration clause. The arbitration clause states:
 "The parties agree that any disputes directly or indirectly relating to this Agreement which cannot be resolved by the parties after good faith negotiations shall be submitted to binding arbitration conducted in Pike County, Alabama, in accordance with the rules of the American Arbitration Association before a mutually agreeable arbitrator."
"This Court has repeatedly stated `"that the words `relating to' in the arbitration context are given a broadconstruction."'" Serra Chevrolet, Inc. v. Hock,891 So.2d 844, 847 (Ala. 2004) (quoting other cases).
"The Federal Arbitration Act creates a strong presumption in favor of *Page 237 
arbitration, and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, `whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or' a like defense to arbitrability.'" Blue Cross Blue Shield of Alabama v.Rigas, 923 So.2d at 1083 (quoting Moses H. Cone Mem'lHosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25,103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). "`[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. . . .'" Blue Cross Blue Shield of Alabama v.Rigas, 923 So.2d at 1083 (quoting Moses H. Cone Mem'lHosp., 460 U.S. at 24-25, 108 S.Ct. 927). "Thus, a motion to compel arbitration should not be denied `unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Ex parte Colquitt, 808 So.2d 1018, 1024
(Ala. 2001) (quoting United Steelworkers of America v.Warrior Gulf Nav. Co., 363 U.S. 574, 582-83,80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); accord David L. Threlkeld Co. v. Metallgesellschaft Ltd., 923 F.2d 245, 248 (2d Cir. 1991); Collins Aikman Prods. Co. v. BuildingSys., Inc., 58 F.3d 16, 19 (2d Cir.1995). While, "as with any other contract, the parties' intentions control, . . . those intentions are generously construed as to issues of arbitrability." Mitsubishi Motors Corp. v. SolerChrysler-Plymouth, Inc., 473 U.S. 614, 626,105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). However, "`"[t]he courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the interest of the parties."'" Lanier World-wide, Inc. v. Clause,875 So.2d 292, 296 (Ala. 2003) (quoting other cases).
This Court has stated that, where the parties have entered into a succession of contractual dealings, "[a]nalyzing the connection and relationship between the subsequently arising controversy and the various earlier contracts and transactions requires first a determination of the nature of the controversy." AmSouth Bank v. Dees, 847 So.2d 923, 934
(Ala. 2002). "Where . . . the dispute has been articulated in a complaint filed to initiate a lawsuit, that statement by the plaintiffs of their claim or claims is essentially determinative. . . ." Dees, 847 So.2d at 934. "Thus, in the litigation context, the plaintiffs have the opportunity, in the first instance, to define the dispute. They may pursue or forgo available claims as they see fit and select the factual underpinnings they deem pertinent to aver." Dees,847 So.2d at 934. In this case, to determine the nature of the plaintiffs' disputes, the Court must look to the factual basis of their disputes.
 I. Nature of the Disputes
Bill Jackson, Warren Jackson, and Carroll formed CJJ in 1998. According to the plaintiffs' complaint, Carroll induced Bill Jackson and Warren Jackson to form CJJ with him by representing that "he would locate and bring to CJJ various convenience store investment opportunities"; that "all profits and assets from any and all convenience store investments or convenience store related matters, in which he was involved, would be paid to CJJ"; and that "he would pay and contribute 40% of all operating and investment costs to the joint enterprise." CJJ alleges that Carroll breached these alleged agreements and breached his fiduciary duties to CJJ. Bill Jackson and Warren Jackson also allege that Carroll breached those promises and that they were injured as a result of various business decisions they made allegedly in reliance on Carroll's representations. The plaintiffs also allege fraud and conspiracy by Carroll and the other defendants. These transactions and the various *Page 238 
other claims that arise from them are discussed below.
In 1999, Carroll formed GOCO so that GOCO could acquire 15 convenience stores. German-American Capital Corporation financed GOCO's acquisition of the stores. After GOCO acquired the stores, Carroll transferred 20% of the ownership of GOCO to "James L. Richardson, or entities owned or controlled by him, Happy Stores, Inc., and/or Happy Retail, L.C. (collectively `Happy Stores')." During the time that GOCO owned and managed the 15 stores, GOCO ordered and received from Petrey Wholesale more than $892,782 in goods and merchandise, but it failed to pay Petrey Wholesale for the items. GOCO at some time transferred management of the 15 stores to Happy Stores. Petrey Wholesale continued to supply goods and merchandise to the convenience stores during the period of Happy Stores' management. When Happy Stores stopped managing the GOCO stores, Happy Stores owed Petrey Wholesale more than $556,000 for goods and merchandise that Petrey Wholesale had supplied; Petrey Wholesale sued Richardson and Happy Stores, but, at that time, did not sue Carroll or GOCO for the $892,782 GOCO owed Petrey Wholesale.
Allegedly in reliance on Carroll's representation that all assets and earnings of his convenience-store businesses, including GOCO, would belong to and be for the benefit of CJJ, Bill Jackson and Warren Jackson agreed to become personally obligated on a $600,000 letter of credit taken out for additional financing for the purchase of the 15 GOCO stores. This letter of credit was later converted into a loan from SouthTrust Corporation.[3] In 2004, SouthTrust sought to renew the loan. Carroll refused to renew the loan; instead he instructed SouthTrust to seize the collateral he had pledged in connection with the loan. However, the collateral Carroll had pledged was worth only approximately 40% of the debt Carroll owed to SouthTrust. Bill Jackson and Warren Jackson allege that they then paid the balance of the loan from SouthTrust, which they had personally guaranteed.
The plaintiffs also claim that Carroll defrauded them in connection with Carroll and GOCO's litigation with German-American. In July 2001, Carroll and GOCO sued German-American as the result of German-American's allegedly improper conduct in financing GOCO's purchase of the 15 convenience stores. Then, in August 2001, GOCO voluntarily filed a petition in bankruptcy.[4] German-American offered to assume and to pay GOCO's $892,782 debt to Petrey Wholesale in exchange for control of the 15 GOCO stores. The plaintiffs allege that Carroll represented to Warren Jackson, then president of Petrey Wholesale and a principal in CJJ, that if Petrey Wholesale would oppose German-American's proposal, GOCO would pay the debt it owed Petrey Wholesale first from any proceeds GOCO received in resolution of its dispute with German-American. According to the plaintiffs, Carroll also represented to Warren Jackson that "a successful resolution of the German-American dispute would result in the 15 stores and any net settlement proceeds being available assets for the benefit of CJJ under the terms of Carroll's prior representations and agreements." The plaintiffs contend that, based on Carroll's assurances, Petrey Wholesale did not accept German-American's offer to pay GOCO's debt. *Page 239 
In October 2001, Carroll and GOCO settled their dispute with German-American. As a result, GOCO held a clear and unencumbered title to the 15 convenience stores. In addition, GOCO received a lump-sum payment in cash. However, GOCO did not use the cash to pay Petrey Wholesale the $892,782 it owed, nor did Carroll pay any of the settlement proceeds to CJJ. Furthermore, Carroll did not transfer to CJJ ownership of the 15 convenience stores now owned by GOCO. Instead, according to the plaintiffs, Carroll represented to Warren Jackson that, if Petrey Wholesale would dismiss its claims against Richardson and Happy Stores, Richardson would relinquish his ownership share in GOCO to Carroll, thereby vesting 100% ownership of GOCO in Carroll. Carroll also allegedly stated that he would then sell the 15 convenience stores, pay Petrey Wholesale from the sales proceeds, and deliver the remaining portion of the sales proceeds to CJJ. In reliance on Carroll's representations, Petrey Wholesale dismissed its action against Richardson and Happy Stores. Richardson transferred his ownership of GOCO to Carroll, thus vesting 100% of GOCO in Carroll. Carroll did not, however, sell the 15 convenience stores and remit the proceeds to CJJ. Petrey Wholesale sued GOCO for the $892,782 GOCO allegedly owed Petrey Wholesale. In addition, Petrey Wholesale sued Carroll alleging that he breached the fiduciary duties he owed Petrey Wholesale as an officer and director of Petrey Wholesale, that he breached his employment contract with Petrey Wholesale, that he breached the San:. Carroll Family Agreement,[5] and that he breached his bonus compensation agreement with Petrey Wholesale.
In April 2004, Carroll sold 9 of the 15 convenience stores to P C Grocers, Inc., an entity owned and controlled by Carroll's family. The plaintiffs claim that Carroll, GOCO, and P C Grocers defrauded them and conspired against them regarding the sale of the nine stores. The plaintiffs contend that "[i]n connection with the closing of the sale to P C Grocers, Carroll, GOCO and P C Grocers created a false and fraudulent closing statement purporting to evidence the receipt and disbursement of sales proceeds in excess of $4,300,000 by virtue of which more than $1,300,000 was diverted from Petrey [Wholesale] and CJJ, to which the proceeds belonged."
The plaintiffs also contend that Carroll had acquired an interest in and employment with Mott Oil Co., a company also engaged in the convenience-store business. According to the plaintiffs, this arrangement violated Carroll's agreement with Bill Jackson and Warren Jackson that he would present all convenience-store-related opportunities to CJJ and that Carroll's interest in and earnings from any convenience-store-related business belonged to CJJ. According to the plaintiffs, Mott Oil paid Carroll in excess of $100,000 per year, and Carroll failed to remit those funds to CJJ.
Bill Jackson and Warren Jackson alleged that Carroll committed fraud because, they assert, they guaranteed a loan by which Mott Oil purchased nine convenience stores from Pro Marketing, LLC, of which CJJ owned a 49% interest, based on Carroll's representations that Carroll owned a 50% share of Mott Oil, which the plaintiffs allege was false, and that the *Page 240 
transaction was in the plaintiffs' best interests.
 II. The Shareholders Agreement
The shareholders agreement, which contains the arbitration clause upon which Carroll and GOCO rely, (1) restricts the transfer of CJJ stock to third parties; (2) provides a procedure for buying or selling shares of CJJ stock among the existing shareholders (Carroll, Bill Jackson, and Warren Jackson); (3) allows CJJ or another shareholder to purchase the shares of a CJJ shareholder upon the involuntary encumbrance of such shares; (4) eliminates the right of a shareholder to appoint a proxy to vote his shares; (5) requires a specific endorsement on each CJJ stock certificate; (6) avoids any transfer of shares made in contravention of the terms of the agreement; (7) provides the parties with the remedy of specific performance for a breach of the agreement; and (8) entitles CJJ and the shareholders to indemnification from any litigation arising out of or relating to the shareholders agreement. Thus, the substance of the shareholders agreement is the disposition of shares of CJJ stock. It also provides indemnification for CJJ and CJJ's shareholders and prohibits voting by proxy.
 III. Relation of the Underlying Disputes to the Shareholders Agreement The trial court concluded that "the lawsuit does not involve, either directly or indirectly, any claim of a violation of the Shareholders Agreement, the disposition of shares in CJJ, or the breach of any duties or limitations created by the Shareholders Agreement or implied by law merely as a result of Sam Carroll's status as a CJJ shareholder."[6]
The plaintiffs argue that the shareholders agreement does not relate to their disputes because they do not claim a breach of the shareholders agreement, because the shareholders agreement is not mentioned anywhere in the complaint, because they do not have to rely on the shareholders agreement to support their claims, because their disputes will not affect the validity of the shareholders agreement, and because neither the articles of *Page 241 
incorporation of CJJ nor its bylaws reference the shareholders agreement or an arbitration clause.
Carroll and GOCO allege that the plaintiffs' disputes relate to the shareholders agreement in that the complaint contends that Carroll is responsible for 40% of all operating and investment costs of CJJ and is entitled to 40% of the profits of CJJ, while Bill Jackson and Warren Jackson are each responsible for 30% of the operating and investment costs of CJJ and entitled to 30% of CJJ's profits. The shareholders agreement does provide that Carroll has 400 shares of CJJ stock and Bill Jackson and Warren Jackson each have 300 shares of CJJ stock. Thus, Carroll owns 40% of CJJ and Bill Jackson and Warren Jackson each own 30% of CJJ. However, the shareholders agreement does not address the expenses and profits upon which Carroll and GOCO premise their argument. The shareholders agreement instead addresses the transfer of shares of stock in CJJ and the capitalization of CJJ. We also note that "[a] corporation is generally regarded as a legal entity separate from its directors, officers, and shareholders; therefore, those persons are generally not individually liable for the debts of the corporation." Exparte AmSouth Bank of America, 669 So.2d 154, 156
(Ala. 1995). Carroll and GOCO's contention that the complaint refers to the shareholders agreement because it refers to a 40/30/30 split of costs and profits is, therefore, not convincing.
In this case, the arbitration clause reads: "The parties agree that any disputes directly or indirectly relating to this Agreement which cannot be resolved by the parties after good faith negotiations shall be submitted to binding arbitration. . . ." Although, "[t]his Court has repeatedly stated `"that the words `relating to' in the arbitration context are given a broad construction,"'" Serra Chevrolet,891 So.2d at 847 (quoting other cases), to come within the arbitration clause the dispute must relate to the shareholders agreement. The shareholders agreement places a limit on the disputes it reaches.
We agree with the trial court's conclusion that the plaintiffs' disputes do not relate to the shareholders agreement. The arbitration clause in the shareholders agreement provides that the parties agree to arbitrate "any disputes directly or indirectly relating" to the shareholders agreement. Although the Court is to give the arbitration clause a broad construction, the plaintiffs' disputes must relate, at least indirectly, to the shareholders agreement before the plaintiffs can be compelled to arbitrate the disputes. We cannot conclude that the trial court erred in concluding that the plaintiffs' claims fell outside the ambit of the shareholders agreement.
The plaintiffs' disputes stem from agreements between them and Carroll and statements that Carroll had made with and to the plaintiffs concerning Carroll's subsequent convenience-store-related opportunities and investments, none of which, even indirectly, relate to the disposition of shares of CJJ stock. Comparing the nature of the disputes asserted by the plaintiffs to the shareholders agreement supports the plaintiffs' contention that those disputes do not relate, either directly or indirectly, to the shareholders agreement. Thus, the plaintiffs' disputes are outside the scope of the arbitration clause.
 Conclusion
The trial court correctly found that the plaintiffs' disputes fall outside the scope of the shareholders agreement that contains the arbitration clause and, therefore, that Carroll and GOCO cannot compel the plaintiffs to arbitrate their claims. We affirm the trial court's order denying Carroll *Page 242 
and GOCO's motion to compel arbitration.
AFFIRMED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.
[1] In addition, the shareholders agreement eliminates the right of a shareholder to appoint a proxy to vote his shares, requires a specific endorsement on each CJJ stock certificate, avoids any transfer made in contravention of the terms of the shareholders agreement, provides the parties with the remedy of specific performance for a breach of the agreement, and entitles CJJ and its shareholders to indemnification in certain situations.
[2] P C Grocers did not file a motion to compel arbitration.
[3] In November 2004, SouthTrust Corporation merged with Wachovia Corporation.
[4] In December 2001, GOCO dismissed its voluntary bankruptcy petition.
[5] In September 1998, Carroll executed the Sam Carroll Family Agreement with Petrey Wholesale and CJJ. The Sam Carroll Family Agreement provided that Carroll would "`devote such time, energy and efforts as are deemed necessary to further the business' of Petrey [Wholesale] and CJJ."
[6] The trial court's order indicates that the trial court placed the burden on Carroll and GOCO to show that the plaintiffs' claims fell within the shareholders agreement, instead of placing the burden on the plaintiffs to show that their claims fell outside of the shareholders agreement ("Despite the conclusory statements of [Carroll and GOCO] to the contrary, [Carroll and GOCO] have failed to carry their burden of establishing that the arbitration clause at issue covers the disputes before the court."). However, Carroll and GOCO, as the movants seeking to compel arbitration, have the burden of showing the existence of a contract that involves interstate commerce and that calls for arbitration. After Carroll and GOCO satisfy this burden, the burden then shifts to the plaintiffs, as the nonmovants, to show that the disputes in this case do not relate to the shareholders agreement. See Fleetwood Enters.,Inc. v. Bruno, 784 So.2d 277, 280 (Ala. 2000) ("The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that that contract evidences a transaction affecting interstate commerce. `After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Auto.,Inc. v. Beavers, 674 So.2d 1260, 1265 n. 1 (Ala. 1995). . . ." (citations and emphasis omitted)). However, our de novo review of the issue indicates that the trial court's conclusion — that the disputes fall outside the shareholders agreement — was nonetheless correct. We can affirm a trial court's judgment for any reason, even one not contemplated by the trial court. See Turner v. WesthamptonCourt, L.L.C., 903 So.2d 82, 88 (Ala. 2004) ("This Court can affirm a trial court's judgment for any reason, but only if the record on appeal evidences the fact that is the basis for the affirmance." (citing Ex parte Ryals, 773 So.2d 1011,1013 (Ala. 2000))).